[No. A116212. First Dist., Div. Three. Nov. 30, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
PIERRE ADANANDUS, Defendant and Appellant.

## COUNSEL

Eric Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon and Donna M. Provenzano, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HORNER, J.**[*]—Defendant Pierre Adanandus appeals the judgment and sentence imposed following his jury trial convictions for murder and attempted murder. Defendant contends (1) the trial court improperly denied his *Wheeler/Batson*[1] motion, and (2) the prosecutor committed misconduct on closing argument. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On April 15, 2005, police responded to reports of a shooting on 65th Avenue in Oakland. Multiple shots were fired from a passing minivan into a station wagon that was parked in a driveway. Ronald Delk, his brother Anthony Delk, and his cousin Joe Wills were seated in the station wagon while talking to their uncle, Eric Delk, who was standing outside the vehicle. In the shooting, Joe Wills was killed and Ronald Delk was shot in the arm. The minivan was later found abandoned and burned. Expended cartridge casings recovered from the scene were subjected to laboratory examination and found to have been fired from a single AK-style rifle. Witnesses stated that there were three African-American males in the minivan. Defendant was subsequently identified as the shooter.

On November 16, 2005, an information was filed charging defendant on count one with first degree murder (Pen. Code,[2] § 187, subd. (a)) and on count two and three of first degree attempted murder (§§ 664, 187, subd. (a)). On each count, the information also alleged personal and intentional use of a firearm causing great bodily injury (§§ 12022.5, subd. (a), 12022.53, subds. (b)–(d), 12022.7, subd. (a)). Also, the first degree murder count carried a driveby special allegation (§ 190.2, subd. (a)(21)).

Jury selection began on September 19, 2006. On October 3, 2006, the trial court denied defendant's *Wheeler/Batson* motion with respect to the prosecutor's exercise of three peremptory challenges against African-American Jurors Jonet H., Betty C. and Channing W. The prosecution launched its case on October 5 and it was submitted to the jury on October 11. On October 12, 2006, the jury returned verdicts of guilty on all three counts and found all allegations true.

On December 8, 2006, defendant was sentenced to life without parole on count one, life with the possibility of parole on count two consecutive to

---

[*]Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*).

[2] Further statutory references are to the Penal Code unless otherwise noted.

count one, and a concurrent life with the possibility of parole on count three. A notice of appeal was filed on the day of sentencing.

DISCUSSION

I. Wheeler/Batson *Motion*

A. *Applicable Legal Standards*

The use of peremptory challenges to excuse prospective jurors based on race violates the federal and state Constitutions. (*Batson, supra,* 476 U.S. at p. 89; *People v. Gray* (2005) 37 Cal.4th 168, 184 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *Wheeler, supra,* 22 Cal.3d at pp. 276–277.) A *Wheeler/Batson* motion "is timely if made before jury impanelment is completed because 'the impanelment of the jury is not deemed complete until the alternates are selected and sworn.'" (*People v. McDermott* (2002) 28 Cal.4th 946, 970 [123 Cal.Rptr.2d 654, 51 P.3d 874].)

"In a recent decision, the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." ' " (*People v. Cornwell* (2005) 37 Cal.4th 50, 66–67 [33 Cal.Rptr.3d 1, 117 P.3d 622] (*Cornwell*), quoting *Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410] (*Johnson*).) Moreover, "[*Johnson*] explain[ed] that 'a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' [Citation.] The defendant having shown membership in a cognizable class, and keeping in mind ' "that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate,' " ' the defendant ' "must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." ' " (*Cornwell, supra,* at p. 67.)

The three-step *Batson* analysis, however, is not so mechanical that the trial court must proceed through each discrete step in ritual fashion. Thus, the trial court may invite the prosecutor to state race-neutral reasons for the

challenged strikes *before* announcing its finding on whether a defendant met the first step of the *Batson* test by making out a prima facie case of discrimination. (*People v. Bonilla* (2007) 41 Cal.4th 313, 343, fn. 13 [60 Cal.Rptr.3d 209, 160 P.3d 84] ["[I]t is the better practice for the trial court to have the prosecution put on the record its race-neutral explanation for any contested peremptory challenge, even when the trial court may ultimately conclude no prima facie case has been made out. This may assist the trial court in evaluating the challenge and will certainly assist reviewing courts in fairly assessing whether any constitutional violation has been established."]; see also *People v. Mayfield* (1997) 14 Cal.4th 668, 723–724 [60 Cal.Rptr.2d 1, 928 P.2d 485] [even where no prima facie case found, court may properly consider reasons actually given by the prosecutor].)

Moreover, where the " ' "trial court denies a *Wheeler* motion without finding a prima facie case of group bias the reviewing court considers the entire record of voir dire. [Citations.] As with other findings of fact, we examine the record for evidence to support the trial court's ruling. Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with 'considerable deference' on appeal. [Citations.] If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm." ' " (*People v. Crittenden* (1994) 9 Cal.4th 83, 116–117 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

B.  *The Trial Court's Prima Facie Ruling*

*(1)*

The trial court invited the prosecutor to offer his reasons for the challenged strikes before issuing any ruling on defendant's *Wheeler/Batson* motion. After the prosecutor concluded his remarks, the court invited comment from defense counsel before ruling as follows: "The court will find that, certainly as to the first [Juror H.] and last [Juror W.], it's not really a close issue; that there is even a prima facie indication there isn't a prima facie case [*sic*]. Ms. [H.] clearly is somebody who the prosecutor would not want on the jury by her answers. . . . As to Ms. [C.], she may have been a fair juror to both sides, as would anybody, maybe. The reality is that any person with a child, an only child, apparently, would have problems that came out, and came out more, could create a certain justification to use a peremptory. [¶] Understating [*sic*], I still think . . . that probably I should make a finding that there has not been a prima facie case made in the circumstances of the entire case. [¶] We have heard the full explanation. I accept it as accurate, as truthful. I do not see race as an issue. Assuming I didn't make a prima facie ruling, I would then accept [the prosecutor's explanations]. I would do so on the whole record. He has accurately stated and pinpointed at length just the areas that I

think any prosecutor would have a problem with . . . any juror, regardless of race. [¶] I'm doing this when confronted with the reality that before we even had questions of two of the three, [the prosecutor] was accepting a jury that did have an African-American on it, and we're about to get a jury that does. [¶] That is the court's ruling. Your *Wheeler* motion is denied."

Arguably, there is an element of ambiguity about whether the trial court actually made a finding that defendant had failed to show a prima facie case of discrimination. Nonetheless, from the totality of the trial court's statements, together with all reasonable inferences to be drawn therefrom, we conclude that the trial court did indeed find that defendant had *not* established a prima facie case.

However, it is also clear that the trial court made no reference to the standard it applied in determining that a prima facie case had not been established. The significance of this is that until *Johnson* (decided on June 13, 2005), California law held that a defendant challenging a strike under *Wheeler/Batson* had to " 'show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias.' " (*Johnson, supra*, 545 U.S. at p. 168.) In *Johnson*, however, the high court held "California's 'more likely than not' standard is an inappropriate yardstick by which to measure the sufficiency of a prima facie case." (*Ibid.*) The high court declared the appropriate standard to be that "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Id.* at p. 170.)

After *Johnson*, our Supreme Court applied a modified standard of review to those *Wheeler/Batson* cases in which the trial court may have applied the "more likely than not" standard disapproved by the high court in *Johnson*. Normally, as noted above, a trial court's ruling on a *Wheeler/Batson* motion is reviewed for substantial evidence, with deference to the trial court's factual assessments. (*People v. Huggins* (2006) 38 Cal.4th 175, 227–228 & fn. 13 [41 Cal.Rptr.3d 593, 131 P.3d 995]; *People v. Crittenden, supra*, 9 Cal.4th at pp. 116–117.) However, where the trial court may have applied the incorrect pre-*Johnson* standard, the Supreme Court stated that it would not defer to the trial court but instead " 'review[s] the record independently to "apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror" on a prohibited discriminatory basis.' " (*People v. Bonilla, supra*, 41 Cal.4th 313, 342; accord, *People v. Bell* (2007) 40 Cal.4th 582, 597 [54 Cal.Rptr.3d 453, 151 P.3d 292]; *People v. Williams* (2006) 40 Cal.4th 287, 310 [52 Cal.Rptr.3d 268, 148 P.3d 47]; *People v. Avila* (2006) 38 Cal.4th 491, 553–554 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; *Cornwell, supra*, 37 Cal.4th at p. 73; *People v. Gray, supra*, 37 Cal.4th at p. 187.)

Defendant contends that we should review the trial court's prima facie ruling under the less deferential standard, apparently under the assumption that the trial court may have applied the erroneous pre-*Johnson* standard in its prima facie analysis. But the trial court delivered its *Wheeler/Batson* ruling some 16 months after *Johnson* was decided. Absent some evidence to the contrary, we are entitled to presume that 16 months after *Johnson* the trial court knew and applied the appropriate law governing a *Wheeler/Batson* motion. (*People v. Coddington* (2000) 23 Cal.4th 529, 644 [97 Cal.Rptr.2d 528, 2 P.3d 1081] ["As an aspect of the presumption that judicial duty is properly performed, we presume . . . that the court knows and applies the correct statutory and case law"], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618]; accord, *Ross v. Superior Court* (1977) 19 Cal.3d 899, 913–914 [141 Cal.Rptr. 133, 569 P.2d 727] [rule that trial court is presumed to follow " 'established law . . .' . . . encompasses a presumption that the trial court applied the proper burden of proof in matters tried to the court"]; *People v. Mosley* (1997) 53 Cal.App.4th 489, 496 [62 Cal.Rptr.2d 268] ["The general rule is that a trial court is presumed to have been aware of and followed the applicable law"].)

In any case, we need not resolve the issue of which standard applies to the trial court's prima facie ruling, because, as explained below, even under an independent review of the record we would "resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror on the basis of race" adversely to defendant. (*Cornwell, supra,* 37 Cal.4th at p. 73.)

### (2)

We begin with the reasons set forth by defense counsel in support of his *Wheeler/Batson* motion. Defense counsel submitted his prima facie case to the trial court on the basis of the following: "The cognizable category would be black persons or African-American citizens, and then I will direct the court to the district attorney's excuse of the [Jonet H.] female, Black; the [Betty C.] female, Black; and [Channing W.], a male Black, and it would seem that any of those three persons would be good jurors. And it appears to me that he's established a pattern of deleting African-Americans from the jury."

According to defense counsel, then, the " ' "totality of the relevant facts giv[ing] rise to an inference of discriminatory purpose" ' " (*Cornwell, supra,* 37 Cal.4th at p. 66) is that the three stricken jurors were all African-American. This alone is insufficient as a matter of law to show a prima facie case of discrimination by the prosecutor in his peremptory challenges, especially since the record reflects that there was an African-American on the

jury panel ultimately sworn, and the prosecutor repeatedly passed that juror on his peremptory challenges. (*Cornwell, supra*, 37 Cal.4th at p. 70 [that "prosecutor challenged one out of two African-American prospective jurors does not support an inference of bias, particularly in view of the circumstance that the other African-American juror had been passed repeatedly by the prosecutor from the beginning of voir dire and ultimately served on the jury"]; accord, *People v. Box* (2000) 23 Cal.4th 1153, 1188–1189 [99 Cal.Rptr.2d 69, 5 P.3d 130] ["[T]he only basis for establishing a prima facie case cited by defense counsel was that the [three] prospective jurors—like defendant—were Black. This is insufficient."]; *People v. Farnam* (2002) 28 Cal.4th 107, 136–137 [121 Cal.Rptr.2d 106, 47 P.3d 988] ["[D]efendant's only stated bases for establishing a prima facie case . . . [,] that (1) four of the first five peremptory challenges exercised by the prosecution were for Black prospective jurors, and (2) a very small minority of jurors on the panel were Black[,] . . . fall short of a prima facie showing"].) Indeed, aside from race, defense counsel made no effort to discuss any other relevant circumstances, " 'such as the prospective jurors' individual characteristics, the nature of the prosecutor's voir dire, or the prospective jurors' answers to questions.' " (*People v. Yeoman* (2003) 31 Cal.4th 93, 115 [2 Cal.Rptr.3d 186, 72 P.3d 1166] [where defense counsel challenged prosecutor's strike of three prospective jurors, "[d]efense counsel's cursory reference to prospective jurors by name, number, occupation and race was insufficient"].)

In addition to the paucity of defense counsel's reasons for a prima facie case, our independent review of the challenged jurors' voir dire also reveals no inference of discrimination on the part of the prosecutor. Prospective Juror Jonet H. lived for a time on the street where the shooting took place, and had a young cousin who was murdered in a shooting the previous year. She stated that her brother was charged with possession of crack cocaine in San Francisco, was sent to prison, got out, and is now back in prison for violation of parole after he was shot. She also expressed the opinion that there is an inherent bias in the criminal justice system against young African-American men, acknowledged that she has "biases," stated that "I would be more impartial in a different kind of case," and admitted it would be difficult for her to be impartial in "this kind of case." Like Jonet H., Prospective Juror Betty C. had a close relative with a criminal history. Betty C. stated her son was in trouble about seven years ago when he was age 24 and living at home. He was stopped by police while driving a friend's car and crack cocaine was found in the car. Her son was prosecuted and pled guilty to a drug offense. The revelations by these jurors of prior negative contact between a close relative and the criminal justice system provide " 'reasons other than racial bias for *any* prosecutor to challenge [them].' " (*People v. Avila, supra*, 38 Cal.4th 491, 554–555 [reasons other than racial bias for challenge included juror's "experience with her brother's involvement in the criminal justice

system, notwithstanding [her] assurances that her prior experiences would not carry over to this case if she were chosen as a juror"]; see also *Cornwell, supra,* 37 Cal.4th at p. 70 ["[V]oir dire disclosed a large number of reasons other than racial bias for *any* prosecutor to challenge [prospective juror], including but not limited to her personal experience with an allegedly unfair homicide prosecution of a close relative and her express distrust of the criminal justice system and its treatment of African-American defendants"]; *People v. Farnam, supra,* 28 Cal.4th at p. 138 ["close relative's adversary contact with the criminal justice system" is one ground upon which the prosecutor might reasonably have challenged prospective jurors].) Similarly, the voir dire of Prospective Juror Channing W. also disclosed " 'reasons other than racial bias for *any* prosecutor to challenge [him].' " (*Avila, supra,* 38 Cal.4th at p. 554.) Channing W. stated that in his view drugs should be legalized, including crack cocaine, because "there's a lot of profit" in the drug trade. He was ambivalent about whether he would be able to hold defendant accountable if the offense stemmed from drug dealing, stated it could possibly affect his participation as a juror if it transpired the shooting was over rock cocaine and drug turf, and was equivocal about the effect his views on the drug laws might have if he was called on as a juror to decide the case. In sum, our independent view of the record, including the discriminatory reasons proffered by defense counsel and the voir dire of the challenged jurors, reveals no inference of discriminatory purpose on the part of the prosecutor.

### C. *The Prosecutor's Explanation of the Strikes*

In addition or alternative to its prima facie ruling, the trial court also evaluated the explanation stated by the prosecutor for the challenged strikes. The trial court stated: "I accept [the prosecutor's explanation] as accurate, as truthful. I do not see race as an issue. Assuming I didn't make a prima facie ruling, I would then accept [the prosecutor's explanations]. I would do so on the whole record. He has accurately stated and pinpointed at length just the areas that I think any prosecutor would have a problem with . . . any juror, regardless of race." Defendant contends the trial court erred in accepting the prosecutor's explanations as race neutral. Given the element of ambiguity in the trial court's *Wheeler/Batson* ruling, which we noted above, we will assume arguendo that the trial court implicitly found a prima facie case but accepted the prosecutor's reasons as race neutral. This leads us to the third step of the *Batson* analysis.[3]

---

[3] We need not concern ourselves with the second step of the *Batson* process because it " 'does not demand an explanation that is persuasive, or even plausible. "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be

## *(1)*

At this stage, "[t]he proper focus . . . is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons." (*People v. Reynoso, supra*, 31 Cal.4th 903, 924.) "The proper function on review [is] to determine whether the trial court's conclusion—that the prosecutor's *subjective* race-neutral reasons for exercising the peremptory challenges at issue . . . were sincere, and that the defendant[] failed to sustain [his] burden . . . is supported by the record when considered under the applicable deferential standard of review." (*Ibid.*) Our review of the record in this regard is a deferential one given that " ' "the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility . . . ." ' " (*Id.* at p. 918, citing *Batson, supra*, 476 U.S. at p. 98, fn. 21; see also *People v. Ervin* (2000) 22 Cal.4th 48, 74 [91 Cal.Rptr.2d 623, 990 P.2d 506] (*Ervin*) ["we review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges 'with great restraint' "].) Moreover, " '[t]he party seeking to justify a suspect excusal need only offer a genuine, reasonably specific, race- or group-neutral explanation related to the particular case being tried. [Citations.] The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice.' " (*Ervin, supra*, 22 Cal.4th at pp. 74–75.) Indeed, " '[j]urors may be excused based on "hunches" and even "arbitrary" exclusion is permissible, *so long as the reasons are not based on impermissible group bias.*' " (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122 [124 Cal.Rptr.2d 373, 52 P.3d 572], italics added; see also *People v. Davenport* (1995) 11 Cal.4th 1171, 1203 [47 Cal.Rptr.2d 800, 906 P.2d 1068] ["peremptory challenges are properly made in response to ' " 'bare looks and gestures,' " ' or the demeanor of a prospective juror"], abrogated on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5 [15 Cal.Rptr.3d 743, 93 P.3d 344].)

## *(2)*

*Jonet H.*

Regarding his strike of Prospective Juror Jonet H., the prosecutor offered the following explanation: "She indicated that she was somewhat familiar with the area [of the crime], which expressed some concern for me, but it was really the rest of the answers that indicated to me that she was not a pro-prosecution juror, and, in fact, couldn't even be declared a neutral and impartial juror. She had some very strong feelings about . . . the role society

---

deemed race neutral." . . . ' " (*People v. Reynoso* (2003) 31 Cal.4th 903, 916 [3 Cal.Rptr.3d 769, 74 P.3d 852], citations omitted (*Reynoso*).) Nothing the prosecutor said was inherently discriminatory.

has played in making criminals victims, and she was very soft on illegal drugs. I'm familiar with the location where she worked at, so we talked extensively about the Americorps program. I was one of the foundation's supervisors in that program back in the summer of 1998, and that program is . . . focused on primarily rehabilitation, and I felt that that juror's answers orally and in the questionnaire embraced that rehabilitation aspect, that she would find it very difficult to arrive at a decision assessing guilt or innocence in a case like this, particularly because it involves narcotics. I felt she was soft on personal responsibility. She felt that individuals who often commit crimes, including violent crime, do so because they don't have any other options in society, and I felt she would not be an appropriate individual in this case—particularly, Mr. Adanandus, rather see him in some light as a potential victim. [¶] I think it will come out that Mr. Adanandus has at least an extensive background in criminal law with contacts with law enforcement given his commitment to the youth authority, and [Juror H.] currently works in several troubled schools in the City of Oakland, and I felt she would have unnecessary impartial [*sic*] compassion for Mr. Adanandus on that point."

The prosecutor's remarks reflect two concerns: first, Juror H.'s opinions on crime and society, and second, her occupation, both of which the prosecutor thought might make her sympathetic towards the accused. There is ample support for the prosecutor's concerns in Juror H.'s voir dire. She stated that in her opinion the criminal justice system was inherently biased against young African-American men. It is a fair inference that it was this very opinion that prompted her to further state that she would find it difficult to be impartial in "this kind of case" involving the drug prosecution of a young African-American male, especially where her own brother had been prosecuted and jailed for drug possession. The prosecutor's perception that Juror H. harbored a generally prodefense partiality or bias was alone a sufficient nonracial justification for his strike. (*People v. Farnam, supra*, 28 Cal.4th at p. 138 [peremptory challenges upheld where prosecutor "articulated her belief that each of the four challenged jurors harbored a pro-defense bias"].) Also, Juror H. stated that she worked as a counselor with Americorps and in that capacity "worked out of different schools in Oakland." The prosecutor's specific concern that Juror H.'s employment as a counselor working in Oakland schools might make her more partial to the defense is another perfectly justifiable reason for the strike. (*Ervin, supra*, 22 Cal.4th at p. 75 [juror was a juvenile counselor with a belief in rehabilitation; properly excused in death penalty case]; *People v. Barber* (1988) 200 Cal.App.3d 378, 389–394 [245 Cal.Rptr. 895] [juror excused because spouse worked for a liberal attorney was a valid use of a peremptory challenge; another juror properly excused because juror was a teacher; prosecutor believed teachers tend to be " 'liberal' " and " 'less prosecution oriented' "]; *People v. Landry* (1996) 49 Cal.App.4th 785, 789–790 [56 Cal.Rptr.2d 824] [juror was a

teacher and was on board of a drug treatment program; another juror had an education background in psychiatry or psychology, and worked in a youth services agency; both properly excused by prosecutor]; *People v. Turner* (1994) 8 Cal.4th 137, 168–172 [32 Cal.Rptr.2d 762, 878 P.2d 521] [juror had trained with Department of Social Services], abrogated on other grounds in *People v. Griffin, supra,* 33 Cal.4th at p. 555, fn. 5.)

*Betty C.*

Regarding Prospective Juror Betty C., the prosecutor stated this explanation for his strike: "At first blush, I actually liked Ms. [C.] and rated her highly based on her responses to the written questionnaire; however, as her responses were flushed out orally in court, it was clear to me that she perhaps was being a little bit close to the vest and not disclosing as much information as she could have regarding her son's involvement with law enforcement. [¶] She indicated he had some contact as a juvenile, yet she did not participate in those, which I find difficult to believe, but even assuming that was the case, I felt she also would be impartial [*sic*] towards Mr. Adanandus, given that his juvenile history and certainly his commitment to the Youth Authority would be coming out. [¶] I also felt that she was a little bit elusive about even describing her familiarity with the Youth Authority or with Juvenile Hall, and it was actually [defense counsel] that flushed that out, because I was not aware that Robert [C.] was director of Juvenile Hall here in Alameda County. And when she responded in that way to [defense counsel], I felt additionally that she was being less than forthright with me about her knowledge of the juvenile system. [¶] In addition, her son's offense as she listed in the questionnaire relates to crack cocaine, and when describing that event, both in the questionnaire and orally in court, she indicated that it was her son who was stopped in a car. She wasn't aware if anyone else was in the car, but he had borrowed the car from a friend and drugs were found, I believe she said in the center console of the car, and the tone in which she said those things led me to believe she did not believe it was her son who was in possession of those narcotics. [¶] Yet when I asked her whether or not she thought that her son was treated fairly by the criminal justice system, she indicated she thought he was, and she did not have extensive information about how that proceeded to trial, but she thought he might have pled guilty. And despite her assertion that the drugs were not his, she still felt he was treated fairly by the criminal justice system. [¶] . . . [¶] She also seemed to know more about her son and her son's criminal history than she was disclosing to me, and she provided [defense counsel] with a little bit more information. I felt based upon her responses, both in the questionnaire and orally, that she could not be a fair and impartial juror. [¶] I felt she was withholding information, and I certainly would not want to have a juror who was withholding information

and withholding their opinion on a case sitting as an ultimate trier of fact in the case. So I felt she would not be an appropriate juror for this case regardless of her race."

The prosecutor's remarks indicate two major concerns: first, his feeling that Juror C. was not being forthright with him on several topics including the extent of her son's involvement with the law and her familiarity with the youth authority system; and second, her son's criminal conviction. On voir dire, Juror C. told the court that she had a brother who works in juvenile probation, yet when asked by defense counsel she stated that her brother-in-law Robert had worked as a probation officer for 25 years and was actually the director of the juvenile hall in Alameda County. Juror C. stated that her son was involved with law enforcement as a juvenile. When the prosecutor asked the reason, she stated, "I think he had stolen something at that time." Juror C. said she went to the juvenile proceedings involving her son on only one occasion. She told the prosecutor she did not know what the initials "Y.A." stand for, then after the prosecutor told her, she stated her son had been held in juvenile custody and had been committed to the youth authority in San Mateo. The prosecutor was entitled to infer from the manner in which Juror C. responded to his questions that she was not being forthright, and on that basis exercise a peremptory challenge to remove her from the jury. (See, e.g., *People v. Montiel* (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277] [manner of answering questions was a legitimate factor for disqualification].) Additionally, Juror C. stated that her son was prosecuted as an adult when he was about 24 years old, after police found crack cocaine in the borrowed car he was driving. She said he pleaded guilty, and stated, "He was treated okay. I mean, it was fine." Juror C.'s son's prior criminal history is another race-neutral basis upon which the prosecutor legitimately exercised the strike. (*People v. Morris* (2003) 107 Cal.App.4th 402, 409 [131 Cal.Rptr.2d 872] ["The nephew of another challenged juror was incarcerated, and the prosecutor might reasonably be concerned that this would make her sympathetic towards defendant"].)

*Channing W.*

In justification of his strike on Prospective Juror Channing W., the prosecutor said: "It was his answers . . . relating to the area of narcotics and criminal responsibility that caused me major concern because . . . in this case evidence will be presented that . . . narcotics were involved and are the precipitating element in murder and attempted murder of victims. . . . [¶] [Juror Channing W.] unequivocally said that he would absolutely support the legalization of crack cocaine, which, as a prosecutor, I absolutely do not support, and he would not be fair and impartial on that issue. [¶] When I asked him . . . about the legalization of crack cocaine and whether or not he

would possibly use his jury service as a way of sending a message to society about the legalization of crack cocaine, and perhaps if crack cocaine was legalized, that this murder would not have taken place, he paused and hesitated and indicated a wavering response that it possibly could influence his decision. [¶] . . . [¶] I was also concerned about his intimate familiarity with the area of 68th Avenue. . . . [¶] . . . But the primary [reason] for excusing Mr. W. was his position on the legalization of crack cocaine, his inability to commit to an answer . . . and I felt his inability to do that could also reflect on his ability to arrive at a firm, resolute decision of guilt in this case . . . ."

Patently, the prosecutor's overriding concern with respect to Juror W. was Juror W.'s view that crack cocaine should be legalized and his ambivalent or noncommittal responses when the prosecutor probed him on whether his views on the legalization of illicit drugs might affect his view of the case. Again, the prosecutor's concerns are amply borne out by Juror W.'s voir dire responses. Juror W. expressed an opinion that drugs should be legalized, including crack cocaine, because there's too much profit in the drug trade, and legalization would reduce the market for drugs. Moreover, he was ambivalent about whether he would be able to hold the accused accountable if the offense arose from drug dealing. Indeed, Juror W. stated it could possibly influence his participation as a juror if it transpired that the shooting was over rock cocaine and drug turf. And Juror W. was unable to say unequivocally that he would put aside his views on drugs and return a guilty verdict if the evidence supported it. In sum, Juror W.'s remarks only confirm that the prosecutor's reasons for using a peremptory strike against him were justifiable and race neutral. (*People v. Dunn* (1995) 40 Cal.App.4th 1039, 1055 [47 Cal.Rptr.2d 638] [juror's view that "people who take amphetamine behave 'differently' . . . supports a race-neutral peremptory challenge"]; *Reynoso, supra,* 31 Cal.4th at p. 917 [peremptory challenges based upon counsel's personal observations of prospective jurors' body language and manner of answering questions are proper].)

Additionally, neither the trial court nor defense counsel below contradicted the prosecutor's account of any of the challenged jurors' demeanor or manner of responding to his questions, suggesting the prosecutor's description was accurate. (See *People v. Ward* (2005) 36 Cal.4th 186, 202 [30 Cal.Rptr.3d 464, 114 P.3d 717] [trial court's finding that the prosecutor's stated reasons were sincere and genuine is entitled to great deference where based on the prospective juror's appearance and demeanor].) Also countering the idea that the prosecutor's strikes were racially motivated is the fact that when the prosecutor exercised the challenged peremptory strikes, an African-American juror was already seated to serve on the jury, and the prosecutor had repeatedly passed that juror. (*Cornwell, supra,* 37 Cal.4th at pp. 69–70 [inference of bias unsupported where "the other African-American juror had

been passed repeatedly by the prosecutor from the beginning of voir dire and ultimately served on the jury"]; see also *Turner, supra,* 8 Cal.4th at p. 168 ["While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection"]; *People v. Irvin* (1996) 46 Cal.App.4th 1340, 1355 [54 Cal.Rptr.2d 450] [same].)

In sum, we have examined the voir dire responses of the three challenged jurors, together with the prosecutor's reasons for excusing them. We conclude that the record amply supports the trial court's determination that the prosecutor offered race-neutral reasons for exercising his peremptory challenges to excuse Jurors Jonet H., Betty C., and Channing W. Accordingly, even if defendant had shown a prima facie inference of discrimination, the trial court did not err by concluding that the prosecutor's proffered reasons for the strikes were genuine and not a pretext for racial discrimination. (*Reynoso, supra,* 31 Cal.4th at p. 924.)

II. *Prosecutorial Misconduct*

*(1)*

Defendant further contends he was deprived of due process and a fair trial by the prosecutor's remarks during closing argument about restoring law and order to the community and about how the victim would have had the courage to testify at trial. Specifically, defendant asserts misconduct in these remarks by the prosecutor near the beginning of closing argument: "Joseph Wills was truly the innocent victim in this case. . . . Didn't know what was going on. Wasn't a player in the game. Was using his cell phone at the time that he caught those fatal bullets to his head. [¶] Now, I submit to you that if we were able to hear from Joseph Wills, he would have been the one person with the courage to come in here and tell you, without a doubt, that [defendant] was the person who shot into that car. [¶] Unfortunately, we're not going to be able to hear that, and you know that. With your verdicts in this case, I'm not asking you to bring Joseph Wills back to his mother; that's not possible. But what you can do with your verdicts in this case is you can restore order. The sense of order, the sense of law, the 2500 block of 65th Avenue in the City of Oakland, because it certainly wasn't there on April 19, 2005, when [defendant] was, to use his own words, 'going down the line,' he was going to leave more bodies on the map." The prosecutor returned to his law and order theme as he concluded his argument: "Ladies and gentlemen, the 2500 block of 65th Avenue . . . had no concept of law and order. None whatsoever. I already told you that with your verdicts, you cannot bring Joseph Wills back to his mother, and you cannot change any of the events

that [defendant] put into place when he started this motion on April 19, 2005. [¶] What you can do is restore justice to that street. That street on that day was without justice. . . . [¶] . . . [¶] You, as jurors in this case, have taken an obligation and oath to uphold the law. Believe in the law. Restore the law to the 2500 block of 65th Avenue, those are the only true and correct verdicts in this case, and I am confident and believe that you'll return those verdicts."

### (2)

The People assert that defendant waived his claim of prosecutorial misconduct because he failed to object or request a curative instruction. We agree. "To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury." (*People v. Brown* (2003) 31 Cal.4th 518, 553 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) However, "the failure to request that the jury be admonished does not forfeit the issue for appeal if an admonition would not have cured the harm caused by the misconduct . . . ." (*People v. Cole* (2004) 33 Cal.4th 1158, 1201 [17 Cal.Rptr.3d 532, 95 P.3d 811].) Defendant's conclusory assertion that any objection and request for admonition would not have cured the prosecutor's allegedly "inflammatory rhetoric" is insufficient to avoid waiver. To the contrary, we conclude any alleged harm arising out of the prosecutor's remarks would have been readily curable by an appropriate and timely admonition. Accordingly, because defendant did not timely object and request a curative admonition and does not show either of those actions would have been futile or would not have cured any prejudice, we conclude he has waived or forfeited any contention on appeal that the prosecutor committed misconduct during his closing argument. (*Cole, supra*, 33 Cal.4th 1158, 1201–1202 [defendant forfeited any claim of prosecutorial misconduct during closing arguments where he failed to object to comments about the Spanish Inquisition and the persecution of early Christians].)

### (3)

In any event, defendant's claim that the cited arguments and comments constituted misconduct lacks merit. "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " (*People v. Cole, supra*, 33 Cal.4th at p. 1202.) The crucial issue

" 'is not the good faith *vel non* of the prosecutor, but the potential injury to the defendant.' " (*People v. Clair* (1992) 2 Cal.4th 629, 661 [7 Cal.Rptr.2d 564, 828 P.2d 705].) We review the prosecutor's remarks to determine whether there is a reasonable likelihood that the jury misconstrued or misapplied them. (*People v. Clair, supra,* 2 Cal.4th at p. 663.) Also, we do not view the prosecutor's remarks in isolation but rather "in the context of the argument as a whole." (*Cole, supra,* 33 Cal.4th at p. 1203.)

Regarding the prosecutor's "law and order" comments, we note that it "is permissible to comment on the serious and increasing menace of criminal conduct and the necessity of a strong sense of duty on the part of jurors. [Citation.] The prosecution may properly urge his points vigorously as long as he does not act unfairly." (*People v. Escarcega* (1969) 273 Cal.App.2d 853, 862–863 [78 Cal.Rptr. 785].) The prosecution's references to the idea of restoring law and order to the community were an appeal for the jury to take its duty seriously, rather than efforts to incite the jury against defendant. Thus, they were not misconduct. (*People v. Wash* (1993) 6 Cal.4th 215, 261–262 [24 Cal.Rptr.2d 421, 861 P.2d 1107] [no misconduct where prosecutor urged "jury 'to make a statement,' to do 'the right thing,' and to restore 'confidence' in the criminal justice system by returning a verdict of death"]; *People v. Lang* (1989) 49 Cal.3d 991, 1041 [264 Cal.Rptr. 386, 782 P.2d 627] [prosecutor's remarks that "if you want to have a voice in your community and an effect upon the law in the community, this is your opportunity" (italics omitted) not improper because "[n]o reasonable juror would have construed the remarks as urging the jurors to follow community sentiment rather than their own judgment"].)

Regarding the prosecutor's remarks that "if we were able to hear from [murder victim] Joseph Wills, he would have been the one person with the courage to come in here and tell you, without a doubt, that [defendant] was the person who shot into that car," they do not rise to the level of misconduct when viewed in the context of the prosecutor's argument as a whole. Defendant suggests the prosecutor was "assert[ing] to the jury what a missing witness would have testified." He was not. The murder victim was not missing, but dead, nor was there any evidence introduced at trial that he had identified defendant as the shooter before he died—and the jury knew all that. Thus there is no likelihood the jury would have understood the prosecutor's remarks to refer to some evidence which could have been, but was not, introduced at trial.[4] Moreover, the prosecutor's remarks about the murder

---

[4] Accordingly, the cases cited by defendant are inapposite because they are cases where the prosecutor clearly referred to facts not in evidence thereby " 'mak[ing] the prosecutor his own witness—offering unsworn testimony not subject to cross-examination.' " (*People v. Hill* (1998) 17 Cal.4th 800, 828 [72 Cal.Rptr.2d 656, 952 P.2d 673]; *id.,* at pp. 828–829 [prosecutor committed misconduct "by asserting she could have called an expert to establish the nature of

victim followed his assessment of the testimony of Eric, Ronald and Anthony Delk—eyewitnesses and victims at the shooting, whom the prosecutor argued could all have identified defendant as the shooter at trial but chose not to because they wanted to "handle it themselves." The prosecutor lambasted the Delks' failure to identify defendant at trial and put it down to the fact they were connected to the drug trade, i.e., "part of the game" or "players in the game." For purposes of argument, the prosecutor contrasted the Delks with "truly the innocent victim in this case . . . [who] [w]asn't a player in the game . . . [and] would have been the one person with the courage to come in here and tell you . . . [defendant] was the person who shot into that car." The prosecutor's comment was brief and isolated, and although to some degree it was an emotional appeal to the jury, it was not "excessively so," but rather was "based on the evidence and fell within the permissible bounds of argument." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1418 [58 Cal.Rptr.3d 368, 157 P.3d 973].)

### *(4)*

Assuming (which we do not) that the prosecutor's argument was improper, it clearly appears, from a review of the entire record, that the argument was harmless, and that no prejudice was (or can be) demonstrated. Even where a defendant shows prosecutorial misconduct occurred, reversal is not required unless the defendant can show he suffered prejudice. (*People v. Arias* (1996) 13 Cal.4th 92, 161 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Error with respect to prosecutorial misconduct is evaluated under the standards enunciated in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], to the extent federal constitutional rights were implicated, and under *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], to the extent only state law issues were involved. (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1074, 1077 [25 Cal.Rptr.2d 213].) The federal standard is implicated where the prosecutor's conduct renders the trial so fundamentally unfair that due process is violated. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214–1216 [40 Cal.Rptr.2d 456, 892 P.2d 1199]; *People v. Harris* (1989) 47 Cal.3d 1047, 1084 [255 Cal.Rptr. 352, 767 P.2d 619].) The state standard applies where the prosecutor uses " ' " 'deceptive or reprehensible methods to attempt to

the substance found in [victim's truck]"]; see *People v. Hall* (2000) 82 Cal.App.4th 813, 817 [98 Cal.Rptr.2d 527] [prosecutor "went too far" when he told the jury the absent officer's testimony would have been repetitive because that was like telling "the jury that the witness, if called, would have testified exactly as [the other officer] did, in a manner favorable to the prosecution"]; *People v. Gaines* (1997) 54 Cal.App.4th 821, 825 [63 Cal.Rptr.2d 188] [misconduct for prosecutor to suggest, among other things, that defense did not call a witness out of concern that the witness's testimony would have impeached defendant's testimony because "prosecutor was in plain effect presenting a condensed version of what he was telling the jury would have been [the witness's] testimony"].)

persuade either the court or the jury.' " ' " (*People v. Gionis, supra*, at p. 1215; see also *People v. Roldan* (2005) 35 Cal.4th 646, 719 [27 Cal.Rptr.3d 360, 110 P.3d 289].)

After a review of the entire record, even if the prosecutor's remarks constituted misconduct, they did not render the trial so fundamentally unfair so as to trigger the *Chapman* standard. Moreover, after a review of the entire record, it is not reasonably probable that a more favorable result would have been reached absent the alleged objectionable argument. Thus, reversal is neither warranted nor appropriate. (*People v. Watson, supra*, 46 Cal.2d at p. 836; *People v. Barnett* (1998) 17 Cal.4th 1044, 1133 [74 Cal.Rptr.2d 121, 954 P.2d 384].) As the jury heard, Eric Delk told police that he recognized one of the people in the van as defendant. Subsequently, Eric Delk identified defendant as the shooter when he picked defendant out at a physical lineup. As to Delk's failure to identify defendant at an earlier photo lineup, the jury learned (from the testimony of a deputy district attorney who had interviewed Delk) that he had told her that he knew all along that defendant was the shooter, but that he had intentionally identified someone else in the photo lineup because defendant was not in custody at the time, and that it was only after he knew that defendant was in custody that he felt safe to identify him as the shooter. Also, physical descriptions of the shooter provided by Ronald and Anthony Delk matched that of defendant. Moreover, defendant made damaging admissions to the investigating police sergeant during a telephone conversation, a tape recording of which was played for the jury. Thus, given the powerful evidence presented to the jury implicating defendant in the crimes, it is not reasonably probable that the outcome would have been more favorable to defendant had the prosecutor not made the allegedly improper remarks during closing argument.

■ Finally, we turn to defendant's claim of ineffective assistance of counsel. Defendant asserts in a conclusory manner that his trial counsel was ineffective for failing to object to the prosecutor's reference to the victim in closing argument. However, as we concluded above, there was no misconduct by the prosecutor and therefore we will not assume counsel was ineffective for failing to object. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007 [50 Cal.Rptr.3d 875] [on direct appeal "a conviction will be reversed for ineffective assistance of counsel only when the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission"].) Here, defendant's trial counsel certainly could have concluded, as we have, that the prosecutor's references did not constitute misconduct, and that therefore an objection would not only have been overruled, but would serve only to call further attention to the argument. This would certainly qualify as a "rational tactical purpose" for counsel's decision. (*Ibid.*) Thus, defendant has not demonstrated that defense counsel's failure to object fell below an objective standard of reasonableness, or that there is a reasonable probability

that, but for counsel's allegedly deficient performance, the result of the trial would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 686–687 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People v. Williams* (1997) 16 Cal.4th 153, 215 [66 Cal.Rptr.2d 123, 940 P.2d 710].) We find defendant's claim of ineffective assistance of counsel to be without merit.

## DISPOSITION

The judgment is affirmed.

McGuiness, P. J., and Siggins, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 12, 2008, S159719. Moreno, J., did not participate therein.