Filed 9/19/13  P. v. Vale CA6
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESSE JOHN VALE,<br><br>    Defendant and Appellant. | H037358<br>(Santa Clara County<br>Super. Ct. No. FF930718) |

Defendant Jesse John Vale was convicted, by jury trial, of carjacking (Pen. Code, § 215)[1] and second degree robbery (§§ 211, 212.5, subd. (c)).  He admitted that he had four prior convictions that qualified as strikes (§§ 667, subds. (b)-(i), 1170.12), that he had three prior serious felony convictions (§ 667, subd. (a)), and that he had served a prior prison term (§ 667.5, subd. (a)).  He was sentenced to an aggregate prison term of 42 years to life for the carjacking, with a concurrent aggregate term of 40 years to life for the robbery.

On appeal, defendant contends the trial court erroneously denied his *Batson/Wheeler* motion, which contested the prosecutor's use of peremptory challenges to remove two prospective jurors with Hispanic surnames.  (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).)  For

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

the reasons stated below, we disagree with defendant's claim and will, therefore, affirm the judgment.

## BACKGROUND

As the facts of defendant's offenses are not relevant to the issue he raises on appeal, we provide a brief overview based on the probation report's summary of the offense.

On May 21, 2009, Elijah Pipkin reported that he had been the victim of a carjacking and a robbery. Pipkin had given a woman named Sophia a ride to a Gilroy residence. At the residence, defendant got into Pipkin's vehicle and took the keys from the ignition. Defendant punched Pipkin and ordered him out of the car. Pipkin complied. Defendant then asked Pipkin for his necklace, bracelet, sunglasses, and wallet. Pipkin gave defendant the necklace, bracelet, sunglasses, and $80 cash from the wallet. Defendant tossed Pipkin's car keys to a second male, who got into Pipkin's vehicle and drove away with Sophia. Defendant drove away in another vehicle.

## DISCUSSION

As noted above, defendant raises one claim on appeal: that the trial court erroneously denied his *Batson/Wheeler* motion, which contested the prosecutor's use of peremptory challenges to remove two prospective jurors with Hispanic surnames.

### A. *Proceedings Below*

Voir dire of prospective jurors began on February 23, 2011. The first group of 18 prospective jurors included two male prospective jurors with the surnames Perez and Espinoza.

#### 1. Prospective Juror Perez

Perez stated that he was a custodian, that he lived with his parents, and that he had siblings in high school and college. He had no children, and he had never served on a jury. He had lived in Morgan Hill for 13 years.

2

The prosecutor asked Perez where he had gone to high school and where his sister attended school. The prosecutor also asked Perez about his job history. Perez indicated he had been doing custodial work for about five months. The prosecutor asked, "What did you do before that?" Perez responded, "Go to school," referring to his high school. The prosecutor asked, "Did you just finish up there last year?" The record is unclear as to whether Perez responded to the question – the reporter's transcript reflects that his response was "High school," but it appears this was a continuation of his response to the prosecutor's prior question. In response to further questions, Perez testified that after high school, he lived at home and "[t]ried to get a job."

### 2. Prospective Juror Espinoza

Espinoza stated that he worked for an energy office. He lived with his wife, daughter, and son-in-law. He had five grandchildren, had lived in Gilroy for six years, and had never served on a jury.

After the trial court asked the prospective jurors whether they had any relatives or friends who had been accused of committing a violent crime, Espinoza stated that his nephew was "in for murder right now." He explained that his nephew was incarcerated at Corcoran State Prison and that the incident had occurred in Tulare County in 2005. Espinoza indicated he had not communicated with his nephew during or after the prosecution. When asked whether he had any reason to believe the case had been handled inappropriately, Espinoza replied, "Well, I think he's still going to court for it right now, so that's as far as I can answer on that." He did not believe that the incident would affect his ability to be impartial.

The prosecutor's only question to Espinoza was a request that he clarify "the relationship between you and the person who is incarcerated." After Espinoza stated, "That's my nephew," the prosecutor asked him no further questions.

3

### 3. Peremptory Challenges

The prosecutor used his first peremptory challenge to excuse Perez. Defendant used his first peremptory challenge to excuse another prospective juror with a Hispanic surname. After the prosecutor used his third peremptory challenge to excuse Espinoza, there was an unreported bench conference.

At the next break, the trial court asked if trial counsel wanted to put anything on the record. Trial counsel asserted that "a jury of [defendant's] peers is just gone." Trial counsel indicated he was making a *Batson/Wheeler* motion and also challenging the composition of the jury venire as not representative of a fair cross-section of the community. (See gen., *Taylor v. Louisiana* (1975) 419 U.S. 522, 528 ["the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial"].)

The trial court agreed that the prosecution had exercised peremptory challenges against two prospective jurors who "appeared to be of Hispanic background." However, the trial court did not "believe a primary foundational showing was made that the use of the peremptories was in a constitutionally invalid way." It ruled, "Therefore, I'm going to deny the [*Batson/Wheeler*] motion." The trial court stated that the People were not required "to state their reasons for the exercise of the challenges" but invited the prosecutor to "make a record nevertheless."

The prosecutor gave three reasons for exercising a peremptory challenge as to Perez. The prosecutor first referred to Perez's age and work history: "He was a younger juror. He had almost no life experience. He is a custodian who's only worked at that job for five months. He came from Sobrato High School, and he made it sound like he started working as a custodian right after that; but then he went on to explain after further questioning that actually he finished up with high school two years earlier and really hasn't been doing anything except living at home in the meantime presumably looking for a job. I think he said he was looking for a job and apparently found one as a

4

custodian. So to me a younger person like that living at home with his parents who's only . . . had one job after high school, which I don't know if he finished, does not have much life experience to sit on a jury."

The prosecutor's next reason for exercising a peremptory challenge as to Perez concerned his attire: "Another thing I noticed was his attire. This juror was wearing long shorts. Hanging out of the pocket of one of the shorts pockets was a red San Francisco 49ers lanyard, which is the type of lanyard you see being handed out in San Jose by the bail bonds people as a free gift. That's what I associated with that. He had long white tube socks on pulled up to his knees and Nike Cortez sneakers on, which I know to be attire of somebody who is a gang member or gang associate or gang affiliate or at least is dressing in a similar way to that. And I should point out that the red color on the lanyard immediately alerted me to the fact that along with the Nike Cortez sneakers this man who did appear to be Hispanic and had a Hispanic sur name [*sic*] might be gang affiliated."

The prosecutor's third reason for exercising a peremptory challenge as to Perez concerned his manner of responding to the trial court's questions: "His – one of the biggest problems I had with him – I don't know if the Court caught this or counsel caught this – was that this juror never answered out loud unless he was directly asked a question. As to all the group questions he kept his mouth shut. Sometimes he would nod or shake his head. Everyone else at the Court's urging answered out loud. This gentleman did not. In fact, I wrote down that he didn't answer out loud when the Court asked that general question of do you agree to volunteer and so that attorneys can follow up will you volunteer this information, and he didn't answer. Then when asked is there any reason you cannot be fair as a group question he had no response. The man didn't even shake his head or nod his head. No response whatsoever, which I took to be disturbing especially with the need for people to be forthright. He was the one person when I asked the question of all 17 jurors if they would hold me to the standard of beyond a reasonable

doubt, no [more] no less, he was the one person who hesitated before acknowledging that he would do that. That caused me concern."

The prosecutor also gave three reasons why he exercised a peremptory challenge as to Espinoza. The first reason concerned his appearance: "He was an older gentleman. He was also Hispanic with a Hispanic sur name [*sic*]. What I noticed about his appearance was that he had an earring in his left ear. It was a stud earring; that cause[d] me concern because it seemed to be sort of an unconventional look for someone of his age. He had a tattoo in the webbing between his thumb and forefinger in his left hand. It was faded dark-blue ink, and it appeared to be either homemade or something that you would get in prison. It obviously wasn't discussed, and I didn't ask him about it; but he had a tattoo in the webbing of his finger, and to me that's something like a prison tattoo or a gang tattoo. I am not [naïve]. I know that lots of people have tattoos. But this did not look like it was professionally done, and the location of it is similar to gang tattoos I've seen in my work as a prosecutor."

The prosecutor's second reason for exercising a peremptory challenge as to Espinoza concerned his nephew's murder conviction: "The biggest problem with him was that he has [a] relative, a nephew, who has been convicted of murder out of this county and is in Corcoran State Prison for it. Apparently it's on appeal because he said he's still going to court for it, but if the nephew is in prison obviously there was a conviction."

The prosecutor's third reason for exercising a peremptory challenge as to Espinoza involved his reaction to something another prospective juror said during voir dire: "When – he did one other thing that bothered me. Juror Number 18 who the court excused later; she was the female writer who had arthritis problems. She made some comment that she was attempted to be carjacked, and the comment was in fact the defendant looked like one of the guys or, you know, he appeared similar appearance to the people who did this to her. And it didn't come out very artfully. But the one visible

6

reaction I saw of the panel was that [Espinoza], . . . he just shook his head. He put his head down and shook his head; and I took that to mean a sign of disapproval, that he didn't like her response, he didn't like her generalizing cross-racially about another race. And I just couldn't see the two of them working together. It caused me some concern and I wrote it down."

The prosecutor pointed out that he had *not* exercised a peremptory challenge to a prospective juror with the last name Velasco, who was "a young Hispanic man." He called Velasco "a fine juror" who had "some at least life experience" and who had been "forthcoming with his answers." The prosecutor noted that this prospective juror had been challenged by the defense, and that the defense had also excused a female Hispanic prospective juror who the prosecutor intended to leave on the panel. The prosecutor also pointed out that the panel, at that time, still included two Hispanic prospective jurors.

The trial court asked trial counsel if he wanted to respond. Trial counsel responded to only one of the prosecutor's statements, calling it "preposterous" that Perez would be "classified as a gangster because he wears a Bad Boys key chain." However, trial counsel stated, "I respect the District Attorney for what reasons he has for doing what he did."

Trial counsel then referred to his complaint about the jury venire, arguing "we do not have a proportionate ratio of people." The prosecutor responded, arguing that there was no "legal basis" for that challenge. The trial court stated, "The objection is noted. The objection is overruled."

Jury selection then continued, and the seated jury ultimately contained four female jurors with Hispanic surnames.[2]

---

[2] Pursuant to the Attorney General's request, we ordered the record on appeal augmented to include the unredacted list of juror names. The list was filed under seal.

***B.***      ***Analysis***

"Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race. [Citations.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix*), citing *Batson, supra,* 476 U.S. 79, and *Wheeler, supra,* 22 Cal.3d 258.)

When the defense raises a challenge to the prosecutor's conduct, "[t]he *Batson* three-step inquiry is well established. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.] The three-step procedure also applies to state constitutional claims. [Citations.]" (*Lenix*, *supra*, 44 Cal.4th at pp. 612-613.)

### 1.      Prima Facie Showing – Mootness

Defendant contends that we should skip the first step of the *Batson* inquiry because it is moot. According to defendant, "the prosecutor gave reasons for the two peremptory challenges, and the trial court ruled on the ultimate question posed by the objection. Therefore, the preliminary question of whether there was a prima facie case is moot."

We disagree that the prima facie showing issue is moot in this case. "[A] trial court's request that the prosecutor provide reasons for his or her exercise of a peremptory challenge is not an implicit finding the defendant has established a prima facie case, and does not moot the issue, in every instance." (*People v. Taylor* (2010) 48 Cal.4th 574, 612 (*Taylor*).)

The issue of whether the defendant made a prima facie showing *is* moot where the prosecutor provides reasons for the peremptory challenges and the trial court "has ruled

8

on the ultimate question of intentional discrimination." (*Hernandez v. New York* (1991) 500 U.S. 352, 359 (*Hernandez*); see also *People v. Elliott* (2012) 53 Cal.4th 535, 560-561; *People v. Mills* (2010) 48 Cal.4th 158, 174 [issue was moot where trial court ruled that defendant failed to make a prima facie showing of group bias but "also passed judgment on the prosecutor's actual reasons for the peremptory challenges"].)

"But when, as here, the trial court states that it does not believe a prima facie case has been made, and then invites the prosecution to justify its challenges for purposes of completing the record on appeal, the question whether a prima facie case has been made is *not* mooted, nor is a finding of a prima facie showing implied. [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 746, emphasis added.) Our Supreme Court has "encouraged trial courts to ask prosecutors to give explanations for contested peremptory challenges, even in the absence of a prima facie showing" but has "emphasize[d] that if a court ultimately concludes that a prima facie showing has not been made, the request for and provision of explanations does not convert a first-stage *Wheeler/Batson* case into a third-stage case." (*People v. Howard* (2008) 42 Cal.4th 1000, 1020 (*Howard*).)

In this case, the trial court ruled that defendant failed to make a prima facie showing that the prosecutor used his peremptory challenges "in a constitutionally invalid way." The trial court then invited the prosecutor to "make a record," but it did not evaluate the prosecutor's stated reasons for the peremptory challenges and never "ruled on the ultimate question of intentional discrimination." (*Hernandez, supra,* 500 U.S. at p. 359; see *Taylor, supra,* 48 Cal.4th at p. 612 [prima facie showing issue was not moot where trial court impliedly found no prima facie showing and "denied the *Wheeler* motion without comment" after the prosecutor stated reasons for the challenges].) Thus, the issue of whether defendant made a prima facie showing that the prosecutor exercised peremptory challenges based on race is not moot.

## 2.    Prima Facie Showing – Analysis

In reviewing the trial court's determination that defendant failed to make the requisite prima facie showing for a *Batson/Wheeler* motion, we apply a deferential standard of review, "considering only whether substantial evidence supports [the trial court's] conclusions. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 341 (*Bonilla*).)

"[A] defendant satisfies the requirements of *Batson's* first step 'by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' [Citations.] The defendant 'should make as complete a record of the circumstances as is feasible.' [Citation.]" (*Taylor, supra,* 48 Cal.4th at p. 614.) In *Taylor,* the court reviewed "the type of evidence that may be particularly useful regarding this inquiry." (*Id.* at p. 615.) "[I]t is relevant whether the record shows that the prosecutor ' " 'struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group.' " ' [Citation.] Also significant is whether the prosecutor failed to engage the prospective jurors ' " 'in more than desultory voir dire, or indeed to ask them any questions at all.' " ' [Citation.] Although the defendant need not be a member of the excluded group in order to claim discriminatory excusals under *Wheeler*, it is relevant ' " 'if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong.' " ' [Citation.]" (*Ibid.*)

"When, as here, 'a trial court denied a [*Batson/Wheeler*] motion because it finds no prima facie case of group bias was established, the reviewing court considers the entire record of voir dire. [Citation.] "If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question, we affirm." ' [Citations.]" (*People v. Panah* (2005) 35 Cal.4th 395, 439 (*Panah*).)

After the prosecutor excused prospective jurors Perez and Espinoza, three prospective jurors with Hispanic surnames remained on the panel; two were still on the

10

panel later, when the *Batson/Wheeler* motion was discussed. Further, a significant number of prospective jurors with Hispanic surnames still remained in the jury pool, and the final jury included four jurors with Hispanic surnames. Thus, the prosecutor did not strike " ' " 'most or all of the members of the identified group from the venire.' " ' " (*Taylor, supra,* 48 Cal.4th at p. 615; see *People v. Blacksher* (2011) 52 Cal.4th 769, 801 [no prima facie showing where, at the time of the defendant's *Batson/Wheeler* motion, there were still two African-American jurors on the panel and the final jury included six African-American jurors].)

The prosecutor also had not " ' " 'used a disproportionate number of his peremptories against the group.' " ' " (*Taylor, supra,* 48 Cal.4th at p. 615.) At the time defendant raised the *Batson/Wheeler* claim, the prosecutor had only exercised three of his 20 peremptory challenges. As defendant acknowledges, the prosecutor did not continue to exercise peremptory challenges to Hispanic-surnamed prospective jurors at the same two-out-of-three rate: he ultimately used eight of his 16 peremptory challenges against prospective jurors with Hispanic surnames, while the defense used eight of its 20 peremptory challenges against prospective jurors with Hispanic surnames.[3]

Finally, the prosecutor asked both Perez and Espinoza questions about the issues he was concerned about – that is, he engaged them " ' " 'in more than desultory voir dire.' " ' " (*Taylor, supra,* 48 Cal.4th at p. 615.) The prosecutor asked a series of questions about Perez's work, school, and family, then challenged Perez primarily because of his lack of "life experience." Although the prosecutor asked Espinoza only one question, it did relate to one of the issues he was concerned about: the fact that one of Espinoza's relatives was serving a prison term.

---

[3] Two of the prospective jurors excused by the defense had hyphenated surnames and, in each case, only one of the two hyphenated names was Hispanic.

In addition, the record here " ' " 'suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question." ' " (*Panah, supra,* 35 Cal.4th at p. 439.)  In reviewing the record, we note that defendant did not challenge the prosecutor's physical description of Espinoza or his description of Espinoza's reaction to the other prospective juror's statements on voir dire.  Defendant also apparently concurred in the prosecutor's description of Perez's clothing and demeanor; he disputed only the significance of Perez's key chain.  We also note that the trial court did not contradict the prosecutor's descriptions of these prospective jurors.  The fact that "neither the trial court nor defense counsel below contradicted the prosecutor's account of any of the challenged jurors' demeanor or manner of responding to his questions[] suggest[s] the prosecutor's description was accurate." (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 510.)

Perez was a younger juror with limited life experience, which "is a race-neutral explanation" for a peremptory challenge.  (*People v. Perez* (1994) 29 Cal.App.4th 1313, 1328.)  The prosecutor could also validly challenge Perez because much of his attire appeared to be similar to what a gang member would wear.  (See *Wheeler, supra,* 22 Cal.3d at p. 275 [prosecutor may "fear bias" if prospective juror's "clothes or hair length suggest an unconventional life-style"].)  Finally, Perez's failure to respond to group questions was a race-neutral reason.  (See *Howard, supra,* 42 Cal.4th at p. 1019 ["An advocate may legitimately be concerned about a prospective juror who will not answer questions."]; *People v. Ward* (2005) 36 Cal.4th 186, 202 (*Ward*) [prospective juror's "body language" and demeanor can support a peremptory challenge].)

As for Espinoza, a family member's involvement in the criminal justice system is a race-neutral explanation, even if the prospective juror avers that he or she can put that experience aside.  (*People v. Avila* (2006) 38 Cal.4th 491, 554-555.)  Espinoza's tattoos and jewelry were also legitimate grounds for his challenge.  (See *Ward, supra,* 36 Cal.4th at p. 202; *Wheeler, supra,* 22 Cal.3d at p. 275.)  Likewise, the prosecutor could validly

challenge Espinoza after he shook his head disapprovingly during another prospective juror's voir dire. (See *Lenix, supra,* 44 Cal.4th at p. 613 [a prospective juror may be excused based upon facial expressions or gestures]; *Ward, supra,* 36 Cal.4th at p. 203 [a prospective juror may be excused base on the fact that he or she "would not fit in" with the other jurors].)

In sum, on this record, substantial evidence supports the trial court's determination that defendant failed to make the requisite prima facie showing for a *Batson/Wheeler* motion, in that "defendant did not meet his burden of raising an inference of discrimination." (*People v. Bell* (2007) 40 Cal.4th 582, 600; see *Bonilla, supra,* 41 Cal.4th at p. 341.)

## DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

ELIA, ACTING P.J.

_____

MÁRQUEZ, J.