Filed 12/19/13  P. v. Beck CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SHEILA LEA BECK,<br><br>Defendant and Appellant. | A135537<br><br>(Del Norte County<br>Super. Ct. Nos. CRF 11-9057,<br>CRF 11-9467, CRF 12-9112) |

Following a jury trial, defendant Sheila Lea Beck was convicted of drug-related offenses as well as possession of deadly weapons.  Pursuant to a plea agreement involving two other pending felony cases, Beck agreed to enter guilty pleas to drug charges in the pending cases in exchange for a three-year sentence for all three criminal cases, including the case tried before a jury.  On appeal, she contends the prosecutor committed misconduct, the trial court erred in sentencing her to state prison instead of county jail, and the court failed to award proper presentence credit.  Although we reject Beck's contentions, we conclude it is necessary to clarify the amount of presentence credit attributable to each of Beck's felony cases.  We affirm the judgment as modified to reflect the proper amount of presentence credit.

**FACTUAL AND PROCEDURAL BACKGROUND**

***Procedural History***

On September 21, 2011, the Del Norte County District Attorney filed a seven-count information charging Beck with transportation of methamphetamine (Health & Saf. Code, § 11379), possession of methamphetamine (Health & Saf. Code, § 11377),

1

possession of deadly weapons (metal knuckles and shuriken stars) (former Pen. Code, § 12020, subd. (a), as amended by Stats. 2008, ch. 699, § 18),[1] misdemeanor possession of drug paraphernalia (Health & Saf. Code, § 11364), misdemeanor unauthorized possession of hypodermic needles (Bus. & Prof. Code, § 4140), misdemeanor receiving stolen property (§ 496, subd. (a)), and misdemeanor driving without a license (Veh. Code, § 12500, subd. (a)). As to the felony counts, it was alleged that Beck committed the offenses while she was on bail or released on her own recognizance in a previously filed criminal case. (§ 12022.1.)

Beck pleaded guilty to the misdemeanor charge of driving without a license. The remaining charges were tried before a jury. The jury could not reach a verdict on the misdemeanor charge of receiving stolen property but found Beck guilty of the remaining counts.

Beck had two other felony cases and one misdemeanor case pending at the time of her jury trial. In exchange for dismissal of the misdemeanor case and a total sentence of three years in the three felony cases, including the one tried before a jury, Beck agreed to plead guilty to one count of transportation of methamphetamine (Health & Saf. Code, § 11379) in one pending felony case (case number CRF 12-9112), and to one count of maintaining a place for selling or using a controlled substance (Health & Saf. Code, § 11366) in the other pending felony case (case number CRF 11-9057).

On May 10, 2012, the trial court sentenced Beck to serve three years in state prison, with the conviction for transportation of methamphetamine designated as the principal term. (Health & Saf. Code, § 11379.) The court imposed a term of two years for possessing methamphetamine (Health & Saf. Code, § 11377) but stayed the sentence pursuant to section 654. The court imposed concurrent terms as to the remaining counts of which Beck was convicted and awarded presentence credit totaling 99 days.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

### *Facts*[2]

At about 12:44 a.m. on July 20, 2011, a sheriff's deputy noticed a pickup truck approach an intersection. A tarp over the truck bed was flapping. After the truck failed to make a proper stop at the intersection, the deputy pulled behind the truck and activated his lights. Instead of pulling over, the driver turned left and then turned into a driveway of a residence. Beck, who was driving the truck, got out of the vehicle and walked toward the deputy. At the same time, Beck's boyfriend, Edward Neeley, quickly came out of the nearby residence. For his safety, the deputy detained Beck and Neeley.

While Beck was detained, she informed the deputy that she did not have a driver's license in her possession. The deputy requested permission to search the back of the truck. After Beck gave him permission to look in the bed of the pickup, the deputy lifted the tarp and saw a table saw with the name "Don Kirk" written on it in several places. There were other power tools in the pickup bed, some of which had Don Kirk's name written on them. Neeley claimed the tools were his and that he had purchased them from a man named Tommy Osburne. Dispatch informed the deputy that Don Kirk had reported a burglary.

Beck told the deputy there was a "rifle" behind the seat of the vehicle. The deputy found a BB gun behind the seat and also saw an open purse next to the driver's seat as well as a methamphetamine pipe on the passenger seat. The methamphetamine pipe appeared to have been used. After locating the methamphetamine pipe and securing the BB gun, the deputy proceeded to conduct a search of the entire vehicle based upon the presence of drug paraphernalia. The deputy placed Beck under arrest after finding two fixed blade knives. The deputy then searched Beck's purse and found the following items inside: a glass methamphetamine pipe with black and white residue, two medical syringes designed for single use for which Beck had no prescription, two silver spoons

---

[2]Our recitation of the facts is limited to the charges tried before a jury. In this appeal, Beck does not contest the factual basis for the charges to which she pleaded guilty.

with residue on them, a black film canister in which there were baggies containing a white crystalline substance that later tested positive for methamphetamine, metal (brass) knuckles, and "shuriken" throwing stars. Neither Beck nor Neeley was present when the deputy searched Beck's purse.

Later that night, the deputy saw Beck and Neeley at the police station. Beck asked him about the charges against her. In Neeley's presence, the deputy told Beck about finding the drug paraphernalia, drugs, and weapons in her purse. Although Neeley had previously stated the tools in the back of the pickup truck were his, he made no claim at the time that any of the items found in Beck's purse belonged to him.

At trial, Don Kirk testified that tools he owned valued at about $5,000 had gone missing from a trailer. He discovered the loss before the date Beck was arrested. He identified the tools found in the truck Beck was driving as some of his stolen tools. Kirk did not know Beck and never gave her permission to possess his tools.

Edward Neeley testified on behalf of the defense at trial. He claimed he had purchased the tools found in the pickup truck from Tommy Osburne, who told Neeley he had bought them at a pawn shop. In light of the cheap price at which the tools were offered for sale, Neeley asked Osburne if the tools were stolen. According to Neeley, Osburne denied that the tools were stolen and gave Neeley a bill of sale reflecting that he sold Beck the tools for $75. Neeley claimed to have received the receipt prepared by Osburne at the time he purchased the tools.

Neeley testified that he had put the drug paraphernalia, drugs, metal knuckles, and shuriken stars in Beck's purse the evening before she was arrested to "get 'em off [his] body while [he] was sleeping." He claimed that he collects weapons other than guns, including throwing knives, Chinese stars, and brass knuckles. According to Neeley, he and Beck were in the process of moving, and he did not want the items he placed in Beck's purse to be put into boxes. He neglected to tell Beck that he put those items in her purse because he fell asleep.

Neeley claimed to have purchased the methamphetamine and weapons found in Beck's purse earlier that day from "some dude." Neeley did not know the "dude's"

4

name.  He purportedly paid $100 for four bags of methamphetamine and $50 for the weapons.   Neeley admitted he did not have a job and asserted he had "money all the time" in response to a question about where he got the money for the drugs.  He could not recall where he got the money for the drugs and weapons but denied getting it from selling stolen tools.  Neeley admitted that he and Beck had used methamphetamine in the day before she was arrested.

In rebuttal, a private investigator hired by Beck testified for the prosecution.  The investigator testified that he interviewed Neeley, who told him that Beck bought the tools for him as a birthday present.  Tommy Osburne also testified in rebuttal.  According to Osburne, Beck and Neeley came to see him about purchasing tools.  Beck and Neeley gave Osburne about $40 to $60 worth of methamphetamine for the tools as well as an air rifle and a chain saw.  Osburne did not provide them with a receipt the day they purchased the tools.  Rather, Beck and Neeley came to Osburne about two to three weeks after purchasing the tools—and after Beck was arrested—with a request that Osburne sign a receipt to help them with their case.  Osburne did not draft the receipt, which misspelled his name.  Because he cannot read, Osburne had them read the receipt to him before he signed it.  Although the receipt indicated that Osburne received $75 for the tools, that was not true.  He denied stealing the tools and claimed he purchased them at a yard sale using proceeds from an "SSI settlement."  Before Osburne came to court to testify, Neeley had intimidated Osburne and threatened to burn his home down if "things didn't go right" at trial.

## DISCUSSION

### I.    PROSECUTORIAL MISCONDUCT

Beck contends the prosecutor committed misconduct by arguing facts not in evidence, by inflaming the passions of the jury, and by vouching for prosecution witnesses.  We address these claims after setting forth the legal framework that guides our analysis.

5

## A. Standard of Review

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

A prosecutor is afforded wide latitude during closing argument. (*People v. Williams* (1997) 16 Cal.4th 153, 221.) " ' "The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." [Citation] "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation], and he may 'use appropriate epithets . . . . ' " ' " (*Ibid.*)

"As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

## B. Background

Beck cites the following passage from the prosecutor's closing argument as evidence of prosecutorial misconduct:

"I was lying in bed this morning about 2:00 in the morning, and I kept thinking, go back to yesterday, this table, these two tables and what they represent. If you look at this table and then you look at this table. And my mom taught me a little of letters. I couldn't help but think of Mr. Dickens' words about this being the best of times; the

worst of times; the spring of hope; the winter of despair; season of light and the season of darkness. We had everything before us. We had nothing before us. [¶] If you look at this table right here, I think of the hands of Don Kirk, a decent man, decent man who spends every day, gets up, goes to work, uses those hands and these tools to create. He uses his craft to build homes for families, for people like you and me for their kids. And somebody breaks into his trailer and steals this and so much more, thousands of dollars of his tools and somebody might say, well, they had insurance. I don't know about the deductible. [¶] But he also had to be down here. He had to give up days to be down here to testify to get in our end of the pool and have to be subjected to cross-examination, which is allowed. I think about what the poor, decent person was made to suffer, and I look at this table here which reflects what that man, and indeed what the best of this community is about. [¶] And then I look over here at this table. And I look at what this represents. And I look at the lies and the deceit. I do not castigate people for being addicts. Stuff happens in life. People have flaws. Sometimes they get up, they take care of their business, they get back on the street, take care of their own side of the street and get their lives in order. I would never, ever go after somebody just because they took a fall and were an addict. [¶] But when you cross the line, when you're taking—when you're stealing or helping provide a market for the people that steal from a decent guy like this, when you're carrying weapons around like this, these are not just for wall ornamentations, when you look at all of this and what it all—the ball of wax that it comes into, I look and I see Mr. Dickens, I see one world. I see the darkness, and I see the light. [¶] I find it very topical that Ed Neeley told you that they started out in Klamath and they came to Crescent City and that Mr. Kirk's break-in and the theft of thousands of dollars of his tools occurred in Smith River because I do believe that there is a darkness that has fallen upon this community, at least in the portion of Mr. Kirk's end of it. And I have to say that I look at all of this poison that these people ingested on their way to the weapons and the stolen property and everything else. And I can't help but think how much more powerful this is than the tsunami that wracked this town in '64. [¶] When I sit down I

and Deputy Donaldson and Detective Griffin and Detective Fleshman, our voices go silent. We pray that yours will be heard. Thank you."

Defense counsel made no objections during the prosecutor's closing argument. After the prosecutor completed the argument, defense counsel asked for a bench conference, which was not recorded. When the jury left to deliberate, defense counsel made a record of his objection to the prosecutor's closing argument. He objected to the prosecutor's remarks because they purportedly violated the court's admonition to limit argument to the evidence and the issues in the case. He specifically objected to casting the matter "as a social issue by his reference to Charles Dickens" and by the implication that the jury "should take the side of the light as opposed to the side of darkness." Defense counsel also objected to the prosecutor saying he was sitting down with members of the sheriff's office. He interpreted the comment to suggest the jury was being asked to send a message to the community. Defense counsel recounted that the court had rejected his requested for a curative comment. He concluded by asking for a mistrial based on prosecutorial misconduct.

The court denied the motion for mistrial after concluding that the prosecutor "did not step over the line on that final argument."

**C.     No Prosecutorial Misconduct Occurred.**

The Attorney General contends that Beck waived the issue of prosecutorial misconduct by failing to object or request an admonition during the argument. According to the Attorney General, defense counsel's objection following the conclusion of the prosecutor's argument came too late to preserve the issue for appeal. To avoid any suggestion that defense counsel was ineffective for failing to object until after the prosecutor had completed his closing argument, we shall address Beck's contentions on their merits.

Beck first argues that the prosecutor inflamed the passions of the jury by personalizing the jurors' roles as members of the community and by urging sympathy for the victim in the context of a dichotomy between good and evil. Beck's argument lacks merit. "[I]t 'is permissible to comment on the serious and increasing menace of criminal

8

conduct and the necessity of a strong sense of duty on the part of jurors.' " (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 513.) In *Adanandus,* the prosecutor urged the jury to " 'restore order' " to the community with their verdict, " 'restore justice to that street [where the murder took place],' " and restore the law. (*Id.* at pp. 511–512.) The Court of Appeal concluded there was no misconduct. "The prosecution's references to the idea of restoring law and order to the community were an appeal for the jury to take its duty seriously, rather than efforts to incite the jury against defendant." (*Id.* at p. 513.)

The same is true of the prosecutor's comments here. The prosecutor's literary references were similar to the argument in *Adanandus* urging the jury to restore law and order to the community. (See *People v. Wash* (1993) 6 Cal.4th 215, 261–262 [not misconduct to urge jury to make a statement, do the right thing, and restore confidence in criminal justice system]; *People v. Lang* (1989) 49 Cal.3d 991, 1041 [reasonable jurors would understand prosecutor was not urging them to follow community sentiment rather than their own judgment when urging them to take the opportunity to have a voice in the community].)

Furthermore, our Supreme Court "has repeatedly held that in closing argument attorneys may use 'illustrations drawn from common experience, history, or *literature*.' [Citations.] As an article in a respected law journal explains, 'fiction, anecdotes, jokes and *Bible* stories are commonly regarded as acceptable' in closing argument." (*People v. Harrison* (2005) 35 Cal.4th 208, 248.) In *Harrison,* the prosecutor made a reference to the biblical apocalypse and described the defendant as the " 'disciple of Satan.' " (*Id.* at p. 247.) The Supreme Court concluded there was no prosecutorial misconduct, reasoning that "a reasonable juror likely would understand the prosecutor's biblical references merely as a powerfully dramatic illustration of the gravity and enormity of defendant's crimes." (*Id.* at p. 248.) Just as in *Harrison,* the jury in this case likely would have understood that the prosecutor's literary references were simply a dramatic illustration of the seriousness of the crimes with which Beck was charged, including theft and possession of drugs and weapons.

9

Beck also complains that the prosecutor alluded to evidence outside the record when he insinuated that Beck was more than just a mere addict. According to Beck, the prosecutor's claim that he would not "go after somebody just because they took a fall and were an addict" suggested that Beck was involved in the sale of methamphetamine. In context, the prosecutor was arguing that while addiction is not against the law, stealing property and possessing illegal weapons are crimes. The prosecutor did not insinuate that Beck sold methamphetamine. His argument was based on the evidence before the jury and was permissible.

As a further basis for claiming prosecutorial misconduct, Beck contends the prosecutor vouched for the credibility of Don Kirk, whose tools were stolen. Beck also argues that the prosecutor sought to play on the jury's sympathies by emphasizing that Kirk was a victim. We are not persuaded that the prosecutor's argument was improper. It is not "misconduct to ask the jury to believe the prosecution's version of events as drawn from the evidence." (*People v. Huggins* (2006) 38 Cal.4th 175, 207.) As long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based upon the evidence and inferences reasonably drawn from the evidence, rather than personal knowledge or belief, the prosecutor's statements do not qualify as improper vouching. (*People v. Frye* (1998) 18 Cal.4th 894, 971, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Here, Kirk testified that he had been building homes and commercial structures for about 35 years. He also testified he discovered that a lock to his trailer had been cut and that work-related tools valued at about $5,000 had been stolen from him. In light of this evidence, the prosecutor did not exceed the scope of allowable argument by suggesting that Kirk was a hard-working individual who was deprived of his ability to carry out his trade as a result of the theft of his tools.

Beck's reliance on *People v. Vance* (2010) 188 Cal.App.4th 1182 is misplaced. In *Vance,* the prosecutor repeatedly argued, over objection, that the jury had to walk in the murder victim's shoes and " 'literally relive in your mind's eye and in your feelings" what the victim experienced. (*Id.* at p. 1194.) The appellate court concluded this line of

10

argument constituted misconduct "because it is a blatant appeal to the jury's natural sympathy for the victim.' " (*Id.* at p. 1188.) In this case, unlike in *Vance*, the prosecutor did not ask the jury to walk in Kirk's shoes or relive his experience. Instead, the prosecutor simply pointed out that Kirk's loss was greater than the tools themselves because he also suffered a financial loss resulting from the impact on his productivity and ability to work.

Finally, Beck claims the prosecutor improperly personalized his role in the trial and vouched for law enforcement witnesses by stating that his voice, along with those of the law enforcement witnesses, would go silent when he sat down. Beck contends the prosecutor impermissibly aligned himself with the witnesses and vouched for them. We disagree. The prosecutor's concluding statement amounted to nothing more than telling jurors that the case would be in their hands after he concluded his rebuttal argument. The remarks could not reasonably be understood as vouching for the credibility of the witnesses or implying that the prosecutor had knowledge outside the evidence presented at trial. Under the circumstances, we conclude the prosecutor's concluding statement did not exceed the bounds of permissible argument.

Even if any of the prosecutor's comments could be construed as improper, Beck has failed to establish she was prejudiced by the purported prosecutorial misconduct.[3] Reversal on the grounds of prosecutorial misconduct is not mandated " 'unless it is reasonably probable that a result more favorable to the defendant would have been

---

[3]Beck requests that this court take judicial notice of two newspaper articles purportedly showing that the district attorney pursued a high profile campaign for the office of district attorney focusing on his personal struggle with methamphetamine addiction and his personal crusade to prosecute methamphetamine cases. We deny the request for judicial notice. Beck has failed to demonstrate why the articles are relevant to her claim that the prosecutor engaged in misconduct during her trial. The articles are not part of the record on appeal, were not presented to the jury, and have no bearing upon whether the prosecutor exceeded the bounds of permissible argument. (See *Von's Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [reviewing courts do not take judicial notice of matters not presented to the trial court absent exceptional circumstances].)

reached without the misconduct.' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070–1071.)

The evidence of Beck's guilt was overwhelming. She was driving alone when she was stopped by the police. Except for the tools that were found in the back of the vehicle, and one methamphetamine pipe found on the passenger seat, all the evidence was discovered in Beck's purse, which was located on the seat next to her. Neeley's claim that he had put the drugs, drug paraphernalia, and weapons inside the purse without Beck's knowledge was simply not credible. There was no reasonable explanation for why he would put those items in her purse. Moreover, although Neeley immediately told the police that the tools in the back of the vehicle were his, he never told them that the items in Beck's purse belonged to him, even after the police told him and Beck what they had found in the purse. In addition, Neeley claimed he bought the drugs from a "dude"—whose name he did not know—and that he purchased the tools, drugs, and weapons—even though he was not working. Again, Neeley was not credible. Other than Neeley's farfetched claim that all the items in Beck's purse belonged to him, Beck had no other explanation as to how the items ended up in her purse.

Finally, the arguments that Beck characterizes as misconduct related primarily to Don Kirk's stolen tools. The tools were the basis for the count of receiving stolen property. The jury did not reach a verdict on that count. This outcome demonstrates that the jurors followed the court's instructions and based their verdict on the evidence rather than sympathy for the victim. It is not reasonably probable the jury was unduly influenced by the prosecutor's concluding comments. (See *People v. Medina* (1995) 11 Cal.4th 694, 758.)

## II. ATTACK ON STATE PRISON SENTENCE

The Criminal Justice Realignment Act of 2011 (Realignment Act)[4] " 'enacted sweeping changes to long-standing sentencing laws,' including replacing prison commitments with county jail commitments for certain felonies and eligible defendants."

---

[4]Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 12, § 1.

12

(*People v. Clytus* (2012) 209 Cal.App.4th 1001, 1004, fn. omitted.)  In this case, the trial court sentenced Beck to serve three years in state prison.  At the time Beck was sentenced, the court noted that her convictions for possessing metal knuckles and shuriken disqualified her from serving a county jail commitment under the Realignment Act.  (See former § 12020, subd. (a), as amended by Stats. 2008, ch. 699, § 18 [crime of possessing metal knuckles or shuriken in subdivision (a)(1) punishable by "county jail not exceeding one year or in the state prison"].)  After Beck was sentenced, the Legislature amended the relevant statutes to provide that convictions for possessing metal knuckles and shuriken qualify for sentencing under the Realignment Act.[5]  (See §§ 21810 [metal knuckles], 22410 [shuriken].)

Even though the relevant statutes were not amended to allow Beck to be sentenced under the Realignment Act until after she was already sentenced, she nevertheless claims she should receive the benefit of the Realignment Act because, by statute, the sentencing provisions of the Realignment Act apply to all persons sentenced on or after October 1, 2011.  (See § 1170, subd. (h)(6).)  Consequently, Beck argues she is required to be sentenced to county jail under the Realignment Act.  In effect, her position is that all subsequent amendments to the Realignment Act—such as adding weapons possession charges to the list of felonies that qualify for county jail commitments—apply retroactively to defendants sentenced before the effective date of the amendments.

It is unnecessary to address the substance of Beck's claim.  As we explain, her claim on appeal amounts to an attack on the validity of the plea, in which she stipulated to a three-year prison sentence as part of a deal that resolved four separate criminal cases.

---

[5]As amended, the statutes defining the crimes of possessing metal knuckles and shuriken provide that the crimes are punishable by "imprisonment in a county jail not exceeding one year or *imprisonment pursuant to subdivision (h) of Section 1170.*" (§§ 21810, 22410, italics added.)  Section 1170, subdivision (h) generally provides that persons convicted of qualifying felonies may serve their sentences in county jail instead of state prison.  The amendments to the statutes concerning metal knuckles and shuriken were effective June 27, 2012, which was after the date Beck was sentenced on May 10, 2012.  (Stats. 2012, ch. 43, §§ 95, 98, 117.)

13

Because she failed to obtain a certificate of probable cause, her claim is not cognizable on appeal.

### A. Background

A jury convicted Beck in case number CRF 11-9467 (case 9467) of transporting methamphetamine, possessing methamphetamine, possessing dangerous weapons (metal knuckles and shuriken), possessing drug paraphernalia, and possessing a hypodermic needle. The court found true the special allegation in case 9467 that Beck was out on bail when she committed the charged offenses. (§ 12021.1.) Also in case 9467, Beck pleaded guilty to a misdemeanor charge of driving without a license.

There were three other pending cases against Beck at the time of her trial in case 9467. Case number CRF 11-9057 (case 9057) was the case in which Beck was released on bail at the time she committed the offenses in case 9467. While she was awaiting trial in case 9467, Beck committed the offenses charged in case number CRF 12-9112 (case 9112). A fourth criminal case, number CRF 11-9133 (case 9133), charged Beck with misdemeanor drug use. (Health & Saf. Code, § 11550, subd. (a).)

After Beck's jury trial but before sentencing in case 9467, the parties negotiated a plea bargain on the pending cases. In case 9057, Beck pleaded guilty to one count of maintaining a place for controlled substances in violation of Health and Safety Code section 11366. In case 9112, Beck pleaded guilty to one count of selling a dangerous drug in violation of Health and Safety Code section 11379. As part of the plea bargain, the prosecutor agreed to dismiss the misdemeanor case (case 9133). The parties agreed that Beck would be sentenced to a total term of three years "as a comprehensive settlement on all four cases." During the plea colloquy, the prosecutor explained: "And the People's understanding is that this three years will be served in the Department of Corrections because of her conviction of the weapons count in the case that went to trial."

Subsequently, the probation department recommended against accepting the plea and questioned why Beck would receive such a low term for the many convictions she suffered. The prosecutor responded that the plea was premised on Beck serving three years in state prison. The prosecutor pointed out that Beck's conviction for possessing

14

dangerous weapons under former section 12020 was the predicate for the commitment to state prison. Defense counsel admitted the prosecutor was "adamant on the state prison."

Although the court expressed concern about the relatively lenient sentence, it ultimately accepted the sentence bargain, although "very, very reluctantly." The court sentenced Beck to serve the middle term of three years for the offense of transporting methamphetamine in case 9467. The court stated: "I'm not going through factors in aggravation or mitigation or criteria with regard to probation since this was a *stipulated term*." (Italics added.) The court chose commitment to state prison because the conviction for possession of dangerous weapons (former § 12020) made Beck ineligible for commitment to county jail under section 1170, subdivision (h). At the prosecutor's request, the court dismissed the out-on-bail special allegation under section 12022.1.[6] As to the remaining counts, the court either imposed a concurrent term or imposed but stayed the sentence pursuant to section 654.

## B. Lack of Certificate of Probable Cause

"[S]ection 1237.5 provides that a defendant may not appeal 'from a judgment of conviction upon a plea of guilty or nolo contendre' unless the defendant has applied to the trial court for, and the trial court has executed and filed, 'a certificate of probable cause for such appeal.' [Citation.] 'Despite this broad language, [the California Supreme Court] has held that two types of issues may be raised on appeal following a guilty or nolo plea without the need for a certificate: issues relating to the validity of a search and seizure . . . and issues regarding proceedings held subsequent to the plea for the purpose of determining the degree of the crime and the penalty to be imposed.' " (*People v. Shelton* (2006) 37 Cal.4th 759, 766.) " '[A] challenge to a negotiated sentence imposed as part of a plea bargain is properly viewed as a challenge to the validity of the plea itself' and thus requires a certificate of probable cause." (*Ibid.*) In *Shelton*, the court concluded

_____

[6]As the court recognized, it could not have imposed the stipulated sentence without dismissing the section 12022.1 special allegation, which mandates a two-year consecutive sentence.

15

the certificate requirement of section 1237.5 applied because the defendant was, in substance, attacking the validity of his plea by attacking the constitutionality of the very sentence he negotiated as part of his plea bargain. (*Id.* at pp. 770–771.)

The court in *People v. Rushing* (2008) 168 Cal.App.4th 354 summarized the certificate requirement as applied to plea bargains involving maximum sentences: "(1) a challenge to the court's authority to impose an agreed upon maximum sentence is a challenge to the validity of the plea requiring a certificate of probable cause, but (2) a challenge to the trial court's exercise of individualized sentencing discretion within an agreed maximum sentence does not require a certificate of probable cause because it does not challenge the trial court's authority to impose the upper term, i.e., it does not attack the validity of the plea agreement but instead attacks the court's exercise of discretion permitted by the agreement." (*Id.* at pp. 359–360.)

Here, the plea bargain resolving four separate criminal cases involved an agreed upon sentence of three years. As the trial court and all parties acknowledged, the plea bargain stipulated that the three-year sentence would be served in state prison rather than county jail. Thus, Beck's challenge amounts to an attack on a negotiated sentence imposed as part of a plea bargain. As such, the claim is properly viewed as a challenge to the validity of the plea itself and requires a certificate of probable cause. (*People v. Shelton, supra,* 37 Cal.4th at p. 766.)

Beck did not request or secure a certificate of probable cause from the trial court. As a result, her challenge to the three-year state prison sentence is not cognizable on appeal. (See *People v. Shelton, supra,* 37 Cal.4th at p. 771; *People v. Rushing, supra,* 168 Cal.App.4th at p. 362.)

III.	**PRESENTENCE CREDIT**

In the lead case that went to trial, case 9467, the trial court awarded Beck a total of 99 days of presentence credit, composed of 67 days for time served plus 32 days of conduct credit. On appeal, Beck raises a twofold challenge to her credit calculation. First, she argues that she is entitled to additional conduct credits attributable to the 66 days she spent in custody after being rearrested on March 6, 2012. Second, she contends

16

that she should receive credit against all of her concurrently-running sentences for the time she served in case 9057 before she was released on July 1, 2011.  As we explain below, we reject Beck's challenges to the calculation of presentence credit.  Nevertheless, because the trial court awarded presentence credit only in case 9467, we will direct the trial court to amend the abstract of judgment to reflect the proper amount of presentence credit to be applied against her concurrent sentences in cases 9057 and 9112.

### A.    Background

As set forth in the probation report, Beck was arrested in case 9057 on February 19, 2011, and released later that same day.  She was rearrested on March 15, 2011, and released again on July 1, 2011.  In case 9467—the case that went to trial—Beck was arrested on July 21, 2011, and released the same day.  In case 9112, Beck was arrested on December 28, 2011, and released the same day.  The probation report reflects that Beck was rearrested on March 6, 2012, and remained in custody until the date of sentencing, May 10, 2012, for a total of 66 days in custody.  This latter period of presentence custody was attributable to all three pending felony cases—9057, 9112, and 9467.[7]

Consequently, in case 9057, Beck served a total of 176 days in custody, composed of 110 days up until July 1, 2011, plus the 66 days from March to May 2012 attributable to all three felony cases.  In case 9112, Beck served a total of 67 days in custody, composed of one day in December 2011, plus the 66 days attributable to all three felony cases.  In case 9467, Beck also served 67 days in custody, composed of one day in July 2011 plus the 66 days served in custody on all three pending felony cases.

The probation officer recommended awarding presentence credit as follows:

(1)    Case 9057—352 days of presentence credit, composed of 176 days of actual custody plus conduct credit in the amount of 176 days.

---

[7]The probation report does not attribute any of Beck's period of presentence custody to the misdemeanor case, case 9133, that was dismissed as part of the plea bargain.

(2) Case 9112—133 days of presentence credit, composed of 67 days of actual custody plus conduct credit in the amount of 66 days.

(3) Case 9467—99 days of presentence credit, composed of 67 days of actual custody plus conduct credit in the amount of 32 days.

As noted above, the court sentenced Beck to serve three years in case 9467 for a violation of Health and Safety Code section 11379, which was treated as the principal term. Beck received concurrent sentences of two years and three years, respectively, in cases 9057 and 9112. In case 9467, the court followed the probation officer's recommendation and awarded Beck a total of 99 days of presentence credit. At the time the court sentenced Beck in case 9057 and case 9112, the court did not mention or award presentence credit to be applied against the sentences imposed in those cases.

When the court asked if there was "[a]nything else," Beck's counsel told the court that Beck had spent time in custody on case 9057 and posed a query as to whether she was entitled to custodial credits against her sentence. The probation officer responded by noting that case 9467 was "the controlling case" and that Beck "might time out on [case] 9057 prior to the termination," but added that, if the court desired, "we could state the credit for that particular case [i.e., case 9057] on the record." The court noted that Beck would only be entitled to credits for time served in case 9057 on that particular case, and that, as a practical matter it would not make any difference whether the credits were awarded in case 9057 because she would still have to serve out her term in case 9467 with fewer credits awarded. In the end, after concluding it would not make any difference whether the additional credits were awarded in case 9057, defense counsel stated that Beck was waiving the credits. The court asked Beck, "So you're waiving any additional credits in that [case 9057]?" Beck responded, "Yeah."

In the abstract of judgment, case 9467 is listed as case A, while case 9057 is listed as case B and case 9112 is listed as case C. The abstract reflects that Beck received a total of 99 days of presentence credit in case A, i.e., case 9467. With respect to cases B and C—i.e., cases 9057 and 9112—the abstract does not reflect any credit for time served.

18

### B.    Credit for Time Served in Case 9057

Beck contends she is entitled to additional credit for time served in case 9057. Although Beck's claim of error and proposed credit calculation are not entirely clear, she appears to contend that she should receive credit against all of her concurrently-running sentences for the days she spent in custody in case 9057 until July 1, 2011.  She relies on the principle that when concurrent sentences are imposed in a single proceeding, the credit for time served is typically applied to each of the concurrent sentences.  (See *People v. Adrian* (1987) 191 Cal.App.3d 868, 876.)  As explained below, that principle is inapplicable here because the time for which Beck seeks credit was served before she had even committed the crimes in cases 9467 and 9112.

Our Supreme Court outlined the basic provisions governing awards of presentence credit in *People v. Duff* (2010) 50 Cal.4th 787, 793:  "Persons who remain in custody prior to sentencing receive credit against their prison terms for all of those days spent in custody prior to sentencing, so long as the presentence custody is attributable to the conduct that led to the conviction.  (§ 2900.5.)  This form of credit is ordinarily referred to as credit for time served.  [¶]  Additional credit may be earned, based on the defendant's work and good conduct during presentence incarceration.  (§ 2900.5, subd. (a), 4019.)  Such presentence credit is referred to as conduct credit."  A partial day spent in county jail is counted as a day of custody for which a defendant is entitled to credit. (*People v. King* (1992) 3 Cal.App.4th 882, 886.)

In *People v. Bruner* (1995) 9 Cal.4th 1178, 1193–1194, the court held that "where a period of presentence custody stems from multiple, unrelated incidents of misconduct, such custody may not be credited against a subsequent formal term of incarceration if the prisoner has not shown that the conduct which underlies the term to be credited was also a 'but for' cause of the earlier restraint."  This "strict causation" rule clearly applies "when the conduct that led to the conviction and sentence was the sole cause of the custody to be credited."  (*Bruner, supra,* 9 Cal.4th at p. 1180.)  However, the court also noted that application of the rule is more difficult "when, as often happens, the custody for which credit is sought had multiple, unrelated causes."  (*Ibid.*)  The requirement of

19

strict causation "is applicable in cases involving the possibility of *duplicate credit* that might create a windfall for the defendant." (*In re Marquez* (2003) 30 Cal.4th 14, 23.)

Here, the 110 days of custody served until July 1, 2011, were solely attributable to case 9057. Indeed, as of July 1, 2011, Beck had not yet even committed the crimes of which she was convicted in cases 9467 and 9112. Consequently, the conduct underlying cases 9467 and 9112 was not a "but for" cause of the period of restraint that ended on July 1, 2011. While Beck should be credited with the 110 days she served until July 1, 2011, against her sentence in case 9057, she is not entitled to receive that credit against her sentences in cases 9467 and 9112.

Beck is mistaken in her reliance on the general principle that credit for time served is applied to all concurrent sentences imposed in a single proceeding. That principle typically comes into play when a defendant is held in presentence custody on multiple charges *at the same time*. (See generally *People v. Kunath* (2012) 203 Cal.App.4th 906, 911; *People v. Ayon* (1987) 196 Cal.App.3d 1114, 1117; *People v. Schuler* (1977) 76 Cal.App.3d 324, 330.) In an opinion describing how to assign credit for presentence custody, the Attorney General explained that "jail time must be credited to all concurrent sentences where the jail time is *actually attributable to all such sentences.*" (*Credit of Jail Time Prior to Sentencing of Convicted Felons*, 55 Ops.Cal.Atty.Gen. 318, 321, italics added (1972).) In this case, Beck's jail time until July 1, 2011, was not attributable to the crimes alleged in cases 9467 and 9112. Accordingly, she is not entitled to credit against all of her concurrent sentences for the time served on and before July 1, 2011.

We conclude the probation officer correctly calculated the days of actual custody attributable to each of the three cases: 176 days of actual custody in case 9057, 67 days of actual custody in case 9112, and 67 days of actual custody in case 9467.

### C.    Conduct Credits

Beck asserts that she is entitled to additional conduct credits for the 66 days she served in presentence custody after being rearrested on March 6, 2012. The Attorney General concedes that Beck is entitled to the additional credits. As we explain, the Attorney General's concession is not well taken. Although Beck may be entitled to

20

additional conduct credits against her sentence in case 9112, she is not entitled to have those additional credits applied against her sentences in cases 9057 and 9467.

Section 4019 governs the award of conduct credits for time served in custody before sentencing. As of September 28, 2010, the version of section 4019 then in effect allowed prisoners to earn conduct credits on a one-for-two basis—i.e., two days of conduct credit would be earned for every four days spent in custody. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48–49.) Effective October 1, 2011, section 4019 was amended to allow prisoners to earn conduct credits on a one-for-one basis— i.e., "four days is deemed to have been served for every two days spent in actual custody." (*Id.* at p. 50.)

The current version of section 4019 provides that "[t]he changes to this section . . . shall apply prospectively and shall apply to prisoners who are confined to a county jail . . . for a crime committed on or after October 1, 2011. Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law." (§ 4019, subd. (h).) Beck contends that the "implication of the last sentence is that any days earned on or after October 1, 2011, shall be calculated at the rate required by the current law . . . ."

Beck's interpretation of section 4019, subdivision (h) has been rejected by the courts that have considered the issue. (See *People v. Rajanayagam, supra,* 211 Cal.App.4th at p. 52; *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1553.) "[T]he Legislature's clear intent was to have the enhanced rate apply *only* to those defendants who committed their crimes on or after October 1, 2011." (*People v. Ellis, supra,* at p. 1553.) "To imply the enhanced conduct credit provision applies to defendants who committed their crimes before the effective date but served time in local custody after the effective date reads too much into the statute and ignores the Legislature's clear intent in subdivision (h)'s first sentence." (*People v. Rajanayagam, supra,* at p. 52.)

Consequently, Beck is entitled to enhanced, one-for-one conduct credits against her sentence in case 9112, because the crime in that case was committed after October 1, 2011. She is not entitled to enhanced conduct credits against her sentences in cases 9057

21

and 9467, even as to a period of custody attributable to those crimes that was served after October 1, 2011, because the crimes in those cases were committed before that date. Her conduct credits in cases 9057 and 9467 are properly calculated at the rate of two days for every four days spent in custody. (See *People v. Rajanayagam, supra*, 211 Cal.App.4th at pp. 48–49.)

Thus, Beck should receive total presentence credit of 133 days in case 9112, composed of 67 days of actual custody plus 66 days of conduct credits. In case 9057, she should receive total presentence credit of 264 days, composed of 176 days of actual custody plus 88 days of conduct credits. And, in case 9467, she should receive total presentence credit of 99 days, composed of 67 actual days plus 32 days of conduct credits.

The abstract of judgment reflects that Beck received 99 days of presentence credit in case 9467. It does not reflect any presentence credit to be applied against her concurrent terms in case 9057 and case 9112. It appears that, at the time of sentencing, the trial court and the probation officer agreed that it was unnecessary to state on the record the presentence credit to be applied to the cases other than case 9467, because that case was "the controlling case" with the "most time." Presumably, the court and probation officer meant that any presentence credit beyond the 99 days awarded in case 9467 would have no practical effect on the amount of time Beck spent in custody on all of her concurrently running sentences. However, the abstract of judgment does not make clear that Beck is entitled to at least 99 days of credit against all of her concurrent sentences.

To avoid any suggestion that Beck is not entitled to presentence credit against her concurrent terms in case 9057 and case 9112, the abstract of judgment should be corrected to reflect the proper amount of presentence credit to be applied against the sentences imposed in those cases.

## DISPOSITION

The sentence is modified to reflect the following awards of presentence credit: (1) in case number CRF 11-9467, credit totaling 99 days, consisting of 67 actual days

plus 32 days of conduct credits; (2) in case number CRF 11-9057, credit totaling 264 days, consisting of 176 days of actual custody plus 88 days of conduct credits; and (3) in case number CRF 12-9112, credit totaling 133 days, consisting of 67 days of actual custody plus 66 days of conduct credits.  The trial court is directed to prepare an amended abstract of judgment in accordance with this disposition and deliver it to the Department of Corrections and Rehabilitation.  Except as so modified, the judgment is affirmed.


_____
McGuiness, P.J.


We concur:


_____
Pollak, J.


_____
Jenkins. J.