Filed 2/11/14  P. v. Hernandez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B244959 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA388322) |
| SAUL HERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura F. Priver, Judge.  Affirmed as modified with directions.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and James William Bilderback II, Deputy Attorney General, for Plaintiff and Respondent.

_____

# INTRODUCTION

A jury found Hernandez guilty of the first degree murder of Jildardo "Hilo" Mariano (Pen. Code,[1] § 187, subd. (a); count 1) and possession of a firearm by a felon (former § 12021, subd. (a)(1); count 2). The jury also found true the allegations in count 1 that Hernandez personally used and intentionally discharged a firearm (§ 12022.53, subds. (b), (c), (d), (e)(1)), as well as the allegation in each count that he committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).[2]

The trial court sentenced defendant to state prison for 25 years to life for the murder, plus a consecutive term of 25 years to life pursuant to section 12022.53, subdivisions (d) and (e)(1), and a consecutive term of 10 years for the criminal street gang enhancement. The court also imposed a 10-year term pursuant to section 12022.53, subdivisions (c) and (e)(1), and a 10-year term pursuant to section 12022.53, subdivisions (b) and (e), but stayed those terms pursuant to section 654. On count 2 the court imposed the middle term of two years to be served concurrently with the sentence imposed on count 1. The court also imposed a 10-year criminal street gang enhancement but stayed it pursuant to section 654. The court imposed various fines and declined to award Hernandez any presentence credit.

On appeal Hernandez argues that the trial court erred (1) in failing to instruct the jury on voluntary manslaughter, (2) in imposing a 10-year criminal street gang enhancement on count 1 pursuant to section 186.22, subdivision (b)(1)(C), (3) in denying him credit for actual time served prior to sentencing, and (4) in imposing unauthorized restitution and parole revocation fines pursuant to sections 1202.4 and 1202.45,

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

[2] The People charged Hernandez in count 1 jointly with codefendant Rodrigo Aceves Estrada. The People further charged Estrada with evading an officer (§ 2800.2, subd. (a); count 3) and hit and run (Veh. Code, § 20002, subd. (a); count 4). The trial court severed the trials, and a jury acquitted Estrada of all charges.

respectively.  We reject Hernandez's contentions of instructional error but conclude that two of his sentencing contentions have merit.

## FACTS

A.    *The Shooting*

On August 26, 2011 Mariano was visiting his wife's aunt.  Mariano and his family did not live in the area.  Hilo was the nickname Mariano's family gave him because his first name, Jildardo, was long.  Mariano had his nickname tattooed on his arm.  He also had a tattoo of his daughter's name and the initial of his wife's first name.  Mariano did not have any gang tattoos, and he was not a member of any gang.

Sujey Zavala and her mother, Elva Zavala,[3] lived on East 35th Street in Los Angeles.  At approximately 8:00 p.m. Sujey was walking down the driveway toward her car when she heard two or three gunshots.  Although she was not certain, it sounded as if all the shots were fired from one gun.  Sujey turned around and saw the front of a white van stopped in the middle of the street between a nearby house and some apartments.  Sujey grabbed her son and ran back into the house.  Half an hour later she went outside and saw Mariano, whom she knew as Hilo, on the ground.  Sujey had not seen Hilo earlier that evening.

That same evening, also at approximately 8:00 p.m., Elva saw a white van parked near 330 East 35th Street but did not pay much attention to it.  A few minutes later Elva heard three or four gunshots, after which the van sped away toward Trinity Street.  Elva saw the back portion of the van as it drove away.  Elva went outside and saw someone lying on the ground.  She went to check on him and recognized him as Hilo, whom she had met through family members.

---

[3]    We will refer to the Zavalas by their first names to avoid confusion.

B.    *The Arrest of Hernandez and Estrada*

Los Angeles Police Officers Guillermo Calleros and Darius Bone were on routine patrol in the area. While at a stoplight at the intersection of Jefferson Boulevard and Trinity Street, Officer Calleros heard four to five gunshots south of Jefferson.[4] Officer Bone heard four gunshots. Officer Calleros drove in the direction of the shots, turning southbound onto Trinity. While on Trinity Street the officers saw a white van driving towards them. Officer Calleros drove in the van's path to see if the person or persons in the van were involved in the shooting. The van's headlights were off, and it had no front license plate. The van stopped about 10 to 15 feet in front of the patrol car. The officers shined their spotlights on the van and made eye contact with the driver and passenger. The passenger was "real nervous" and "started fumbling [with] something in his lap." Believing they were going to stop, Officer Calleros got out of the car, pointed his gun at them, and gave them orders. At that point the driver put the van in reverse and accelerated. The tires screeched, and the van collided with parked cars. Officer Calleros got back in his car. While he attempted to start his car, the driver of the van put it back into drive and drove past Officers Calleros and Bone, who then pursued the van. The pursuit ended when the van crashed into a parked green truck on 25th Street near Main Street.

Estrada, the driver of the van, complied with officers' commands and was taken into custody. Hernandez, who was the passenger, did not comply and got out of the van. Officers found Hernandez lying on his stomach underneath the green truck and saw a blue steel revolver next to him. Officers took Hernandez into custody and recovered the revolver. The police found five casings inside the cylinder of the revolver.[5]

---

[4]    Officer Calleros could not tell whether the shots were fired from one gun or multiple guns.

[5]    Officers did not recover any casings in the area where the shooting had occurred.

4

Inside the van officers found a black hat with an "L.A. symbol on it," Estrada's identification, and a little bit of marijuana. Hernandez was wearing a black Chicago baseball cap with a red bill.

Officer Brendy Ponce accompanied Hernandez, who was injured during the collision, to U.S.C. Medical Center. In response to questions by medical personnel, Officer Ponce stated that Hernandez was a shooting suspect who had been in a collision following a pursuit. At that point, Hernandez spontaneously stated, "We only shot one fool sir and the 36er shot us back."

C.    *The Police Investigation*

After the police had arrested Hernandez and Estrada, Officer Todd Bracht and his partner drove to the site of the shooting on East 35th Street. Officer Bracht spoke with Sujey who stated that she saw the passenger door of the white van open, heard three to four shots, and saw the van drive eastbound on East 35th Street and then turn left onto Trinity Street out of sight. Sujey included these observations in a written statement. Officer Bracht then took Sujey to view the van that had crashed into the green truck. Sujey said the van looked like the vehicle she had seen.[6] In her written statement to police, Sujey stated that she saw the front passenger door open and heard three or four shots.

Los Angeles Police Officer Mario Flores interviewed Elva, who stated that she was in her front yard on East 35th Street when she saw a white van parked in front of 330 East 35th Street. Elva observed the front passenger door of the white van open, and she heard gunshots after which she ran back inside her home. Officer Flores later took Elva

---

[6]    At trial, Sujey had no present memory of seeing anyone in the van, nor did she remember seeing anyone get out of or into the van. She also denied seeing it drive away. Although Sujey acknowledged that she accompanied a police officer to another location to see if she could identify a white van, Sujey was unsure whether it was the same van because she had only seen the front of it.

to see if she could identify the white van. She was able to do so after seeing a sticker bearing an "On Trac" logo on the rear left side of the door.

Officer Daniel Hayashi spoke to Y.H., a minor. Y.H., though scared, nervous, and reluctant to talk to police, said he saw a male wearing a black L.A. hat get out of a white van and shoot the victim about seven to eight times then return to the van and flee eastbound. Y.H. did not make a written statement, however, because he was scared.[7]

Mariano died on August 30. An autopsy revealed that he had been shot three times. A gunshot wound he suffered to his back was fatal.[8] An analysis of Hernandez's revolver recovered at the time of his arrest, the five casings that remained in the revolver, and the fatal bullet recovered from Mariano's body revealed that Hernandez's revolver fired the fatal bullet.

D.    *Gang Evidence*

Los Angeles Police Officer Kenneth Ahn, a gang expert, identified Hernandez and Estrada as members of the Ghetto Boyz Gang. The Ghetto Boyz Gang and the 36th

---

[7]    At trial Y.H. recounted that on the day of the shooting he was visiting his aunt who lived in an apartment. Y.H. did not live in the area. Y.H. was with his "little cousin" when Y.H. heard "[p]robably six" shots. Y.H. told his cousin who was scared to be quiet, and the two of them got down on the ground. Y.H. remembered seeing a cap as he got down. Y.H., however, was unable to identify the baseball cap found in the van or worn by Hernandez. Y.H. acknowledged that he spoke to a police officer after the shooting and told him what he saw and heard. He denied telling the officer that he saw a white van parked on the street, that he saw someone get out of the van, that he saw a man get out of the van and shoot the victim seven to eight times, that he saw the shooter get back into the van, and that he saw the van drive toward Trinity. When asked whether he told the police that the man who got out of the van was wearing an cap, Y.H. said, "Something like that." He denied telling the officer that it was an L.A. hat. Y.H. only recalled telling the officer he saw a cap and heard gunshots.

[8]    The coroner also collected a gunshot residue kit from Mariano. While such kits are routinely collected, they are not routinely analyzed. The detectives did not request an analysis of the kit because there was no evidence that Hernandez and Mariano had exchanged gunfire.

Street Gang are rivals.  The shooting took place in territory claimed by the 36th Street Gang.[9]

## DISCUSSION

A. *The Trial Court Did Not Err by Refusing to Instruct on Voluntary Manslaughter Based on Imperfect Self-Defense*

"Manslaughter is a lesser included offense of murder.  [Citations.]  The mens rea element required for murder is a state of mind constituting either express or implied malice.  A person who kills without malice does not commit murder." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)  "[A] defendant who intentionally commits an unlawful killing without malice is guilty only of voluntary manslaughter." (*People v. Blacksher* (2011) 52 Cal.4th 769, 832.)  "For purposes of voluntary manslaughter, an intentional unlawful killing can lack malice when the defendant acted under a ""'sudden quarrel or heat of passion'"" or when the defendant acted under '"[an] unreasonable but good faith belief in having to act in self-defense."'  [Citation.]" (*Ibid.*; see *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1231 ["[i]mperfect self-defense is not a 'true' defense, but a 'shorthand description of one form of voluntary manslaughter'"].)

"Unreasonable self-defense, also called imperfect self-defense, 'obviates malice because that most culpable of mental states "cannot coexist" with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand.' [Citation.]  A killing in imperfect self-defense constitutes, by definition, unreasonable conduct because the belief in the need to defend is not reasonable.  The killing is nevertheless mitigated because of the defendant's misguided but good faith belief.  Thus, the societal recognition of mitigation is the same.  In both heat of passion and imperfect self-defense scenarios, the killer who acts unreasonably commits a crime.  Yet the degree

---

[9]     Hernandez does not challenge the jury's finding that his crimes were committed for the benefit of a criminal street gang within the meaning of section 186.22.

7

of culpability is reduced from murder to manslaughter.  Adequate provocation or an unreasonable but good faith belief in the need to defend operates on the killer's mental state to prevent the formation of malice."  (*People v. Beltran*, *supra*, 56 Cal.4th at p. 951.)

At trial counsel for Hernandez asked the court to instruct the jury on voluntary manslaughter based on imperfect self-defense, relying on Hernandez's spontaneous statement at the hospital, "We only shot one fool sir and the 36er shot us back."  The trial court denied the request.  Hernandez now contends that the trial court erred by refusing to give the requested instruction.  "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense."  (*People v. Cole* (2004) 33 Cal.4th 1158, 1215; see *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137 ["[w]e review de novo a trial court's failure to instruct on a lesser included offense" and "in doing so we view the evidence in the light most favorable to the defendant"].)

"'"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." [Citations.]  "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." [Citations.]' [Citations.] 'Nevertheless, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." [Citation.]  Such instructions are required only where there is "substantial evidence" from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense. [Citations.]' [Citation.]"  (*People v. Whalen* (2013) 56 Cal.4th 1, 68; see *People v. Cole*, *supra*, 33 Cal.4th at p. 1215 ["even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction'"].)  Thus, in a murder case the trial court need only instruct on imperfect self-defense "'where there is substantial evidence that the defendant killed in unreasonable self-defense, not when the evidence is "minimal and insubstantial." [Citation.]' [Citation.]"  (*People v. Valenzuela*, *supra*, 199 Cal.App.4th at pp. 1231-1232.)

8

Hernandez's spontaneous statement in the hospital, "We only shot one fool sir and the 36er shot us back", was an admission that he was the instigator, making the defense of imperfect self-defense unavailable to him to negate malice. For example, in *People v. Enraca* (2012) 53 Cal.4th 735, the defendant argued that "there was no factual basis for instructing the jury that the doctrines of perfect and imperfect self-defense cannot be invoked by a defendant whose own wrongful conduct created the circumstances in which the adversary's attack was legally justified." (*Id.* at p. 761.) The California Supreme Court rejected this argument: "'The concepts of perfect and imperfect self-defense are not entirely separate, but are intertwined. . . . "[T]he ordinary self-defense doctrine— applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." [Citation.]' [Citations.]" (*Ibid.*)

Here, even if there were evidence to support the inference that there was another shooter who returned fire, because Hernandez entered rival gang territory and admittedly was the first to shoot "'a claim of imperfect self-defense would be unavailable because a claim of perfect self-defense would have been unavailable had the belief been reasonable.'" (*People Enraca*, *supra*, 53 Cal.4th at p. 761.) In other words, "'not every unreasonable belief will support a claim of imperfect self-defense but only one that, if reasonable, would support a claim of perfect self-defense.' [Citations.]" (*Ibid*.)

In support of his claim of instructional error, Hernandez also relies on the differences in the witnesses' accounts of the number of shots they heard, particularly Y.H.'s statement to Officer Hayashi that he heard seven or eight shots. Hernandez suggests that because his revolver was incapable of firing that many shots, there had to be another shooter. This suggestion is pure speculation. (See *People v. Valdez* (2004) 32 Cal.4th 73, 116 ["'"[s]peculation is an insufficient basis upon which to require the giving of an instruction on a lesser included offense"'"]; *People v. Berryman* (1993) 6 Cal.4th

9

1048, 1081 [court has no obligation to instruct on lesser included offense unless supported by substantial evidence, and "speculation is not evidence, less still substantial evidence"], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1; *People v. McCloud* (2012) 211 Cal.App.4th 788, 807 ["'[s]peculation is not substantial evidence'"].) Y.H. was a minor who was very frightened by the shooting and even more afraid to talk to the police. Each of the other witnesses heard fewer than five shots. Moreover, the police searched the crime scene and found no shell casings or evidence suggesting that a gun other than Hernandez's had been fired, thus dispelling the speculative suggestion that there was another shooter. There also was no evidence that one or more members of the 36th Street gang were out on the street when Hernandez fired his revolver. Finally, as explained above, even if there were any return fire from another shooter, as the instigator Hernandez was not entitled to an instruction on imperfect self-defense.

Therefore, the trial court properly denied Hernandez's request to instruct the jury on voluntary manslaughter based on a theory of imperfect self-defense. (See *People v. Avila* (2009) 46 Cal.4th 680, 707 [request for voluntary manslaughter instruction based on heat of passion properly denied in the absence of substantial evidence of provocation]; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 81-82 [request for instructions on self-defense and imperfect self-defense properly denied absent evidence that the defendant had a good faith belief in the need to defend himself].)

B. *The 10-year Criminal Street Gang Enhancement Imposed on Count 1 Must Be Stricken*

Hernandez argues that the 10-year criminal gang enhancement imposed on the murder count must be reversed because section 186.22, subdivision (b)(1)(C), does not authorize imposition of an enhanced term for first degree murder, a violent felony subject to imprisonment for life. As the People concede, Hernandez is correct.

Section 186.22, subdivision (b)(1), provides: "Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit

10

of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows: [¶] . . . [¶] (C) If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years." Subdivision (b)(5) of section 186.22 states: "Except as provided in paragraph (4), any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

In *People v. Lopez* (2005) 34 Cal.4th 1002 the California Supreme Court addressed the question of "whether a first degree murder committed for the benefit of a gang is subject to the 10-year enhancement in section 186.22[, subdivision] (b)(1)(C) or whether such a murder falls within that subdivision's excepting clause and is governed instead by the 15-year minimum parole eligibility term in section 186.22[, subdivision] (b)(5)." (*Id*. at p. 1006.) The Supreme Court held that the "plain language of section 186.22[, subdivision] (b)(5) governs" and that it is error to "apply[] the 10-year gang enhancement to [a] defendant's first degree murder conviction." (*Id.* at p. 1011.) Therefore, the 10-year criminal street gang enhancement imposed on count 1 must be stricken and replaced with the 15-year minimum term of section 186.22, subdivision (b)(5).

C.     *Hernandez Is Entitled to Presentence Custody Credits for Actual Time Served*

Hernandez argues that the trial court erred in failing to award him credit for time served. As the People concede, Hernandez is correct again.

At the sentencing hearing, the trial court stated "[t]here is no presentence credits under the Penal Code." When trial counsel for Hernandez stated, "421 actual days I

11

believe,"[10] the trial court responded that Hernandez was not entitled to presence credit under section 2933 because he had been convicted of murder.

Section 2933, however, pertains only to work time credits, and while it is true that a defendant who is convicted of murder "shall not accrue any credit, as specified in Section 2933 . . ." (§ 2933.2, subd. (a)), a defendant is entitled to presence custody credit for actual time served pursuant to section 2900.5. "In all felony and misdemeanor convictions, . . . when the defendant has been in custody, including, but not limited to, any time spent in a jail, . . . all days of custody of the defendant, including days . . . credited to the period of confinement pursuant to Section 4019, . . . shall be credited upon his or her term of imprisonment . . . ." (§ 2900.5, subd. (a).) Such credit "shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted" and "shall be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed." (*Id.*, subd. (b).) Thus, "'[p]ersons who remain in custody prior to sentencing receive credit against their prison terms for all of those days spent in custody prior to sentencing, so long as the presence custody is attributable to the conduct that led to the conviction. [Citation.] This form of credit ordinarily is referred to as credit for time served.'" (*People v. Jacobs* (2013) 220 Cal.App.4th 67, 77.) "Calculation of custody credit begins on the day of arrest and continues through the day of sentencing. [Citation.]" (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.)

At the time of sentencing, trial counsel for Hernandez claimed that Hernandez was entitled to 421 days of actual credit. On appeal, Hernandez argues that he is entitled to 433 days of actual credit.

Contrary to the People's assertion, the record on appeal sufficiently demonstrates that Hernandez was in continuous custody from the date of his arrest to the date of his sentencing. Hernandez was arrested on August 26, 2011. At his preliminary hearing on

---

**10** The People incorrectly assert that the prosecutor made the 421-day calculation.

12

December 19, 2011 the court held Hernandez to answer, set bail at $2,205,000 (which Hernandez did not post), committed him to the custody of the Los Angeles Sheriff, and set his arraignment for January 3, 2012. The trial court arraigned Hernandez on January 3, and he remained in custody thereafter.

In a pre-conviction report prepared on December 30, 2011 for the arraignment, the probation officer listed Hernandez's "estimated days in jail [in] this case" as "131." Because this is the precise number of days to which Hernandez would have been in custody on the date of his arraignment, January 3, 2012, if he remained in custody following his arrest on August 26, 2011, and because, as the People concede and the record reflects, Hernandez was in continuous custody from his arraignment date to his October 31, 2012 sentencing date, Hernandez was in continuous custody from the date of his arrest on August 26, 2011 until his sentencing on October 31, 2012. Therefore on the date of sentencing Hernandez had spent 433 days in custody.

While a reviewing court may resolve a miscalculation of custody credits in the interest of economy where other issues are presented for resolution on appeal (*People v. Florez* (2005) 132 Cal.App.4th 314, 318, fn. 12; *People v. Jones* (2000) 82 Cal.App.4th 485, 493), we decline to do so in this case. The record reflects that Hernandez was on formal probation at the time of his arrest in case number BA378808. The court revoked his probation and scheduled a probation violation. Although two March 2012 minute orders reference the trailing probation violation, the record is thereafter silent on the matter. Because credit for time served "shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted" and "shall be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed" (§ 2900.5, subd. (b)), we believe that the trial court is in the best position to calculate the presentence custody credits to which Hernandez is entitled. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 187 ["a trial court may sometimes be in a better position than an appellate court to correct a particular error"].) Therefore, we remand for calculation of credits for actual time served.

13

D.      *Restitution and Parole Revocation Fines*

At sentencing the trial court imposed a $240 restitution fine pursuant to section 1202.4, subdivision (b)(1), and a $240 parole revocation restitution fine pursuant to section 1202.45. The latter fine was stayed pending the successful completion of parole. Hernandez did not object to the imposition of either fine. Hernandez argues that because the minimum fine under the applicable statute was $200 and the minimum fee under the amended version of the statute was $240, the trial court's imposition of the $240 fee was unauthorized and violated the ex post facto clause, and therefore must be reduced to $200.

"It is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions. [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 143; accord, *People v. Nuckles* (2013) 56 Cal.4th 601, 608.) A parole revocation fine is viewed similarly. (*People v. Cruz* (2012) 207 Cal.App.4th 664, 672, fn. 8; *People v. Flores* (2009) 176 Cal.App.4th 1171, 1181-1182.) "The proscription against the ex post facto application of laws . . . is designed to prevent a criminal defendant from being unfairly disadvantaged by a change in the law occurring between the time of the crime and the time of trial. [Citations.]" (*Flores, supra*, at p. 1176.) "'[T]he central concern to the ex post facto prohibition is '''the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.''''' [Citation.]" (*People v. Acosta* (2009) 176 Cal.App.4th 472, 476.)

When Hernandez committed his crimes on August 26, 2011, section 1202.4, subdivision (b)(1), mandated the imposition of a restitution fine of "not . . . less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000), if the person is convicted of a felony . . . ." (Stats. 2011, ch. 45, § 1 [eff. July 1, 2011 to Dec. 31, 2011].) Before Hernandez's trial commenced, however, the Legislature amended section 1202.4, subdivision (b)(1), by raising the minimum restitution fine to $240. (Stats 2011, ch. 358, § 1 [eff. Jan. 1, 2012 to Dec. 31, 2012].) At all times relevant to this appeal, section 1202.45 mandated the imposition of a parole revocation fine in the same amount

14

as the restitution fine in cases where the defendant's sentence included a period of parole. (Stats. 2007, ch. 302, § 15 [eff. Jan. l, 2008 to Dec. 31, 2012].)

Hernandez forfeited his challenges to the trial court's order imposing the restitution and parole revocation fines because he did not object to either of them before or at his sentencing. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 881 ["the forfeiture rule applies in the context of sentencing as in other areas of criminal law"]; *People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218 ["[a]n objection to the amount of restitution may be forfeited if not raised in the trial court"]; cf. *People v. McCullough* (2013) 56 Cal.4th 589, 594 ["[o]ur application of the forfeiture bar to sentencing matters is of recent vintage"].) Nevertheless, a defendant may challenge an unlawful or unauthorized sentence on appeal even if he or she did not object in the trial court. (*People v. Smith* (2001) 24 Cal.4th 849, 852; *People v. Cropsey* (2010) 184 Cal.App.4th 961, 965, fn. 3.) The unauthorized sentence exception to the forfeiture doctrine that normally applies, however, is """"a narrow exception"""" and only applies where the sentence """"could not lawfully be imposed under any circumstance in the particular case[]" . . . .' [Citation.]" (*People v. Turrin* (2009) 176 Cal.App.4th 1200, 1205; see *People v. Brach* (2002) 95 Cal.App.4th 571, 578.) Here, the version of section 1202.4, subdivision (b)(1), in effect at the time of Hernandez's crime provided that the court had discretion to set the restitution between the minimum of $200 and the maximum of $10,000, "commensurate with the seriousness of the offense." (See *People v. Kramis* (2012) 209 Cal.App.4th 346, 349-350 & fn. 2.) Thus, the $240 restitution fine and the $240 parole revocation fine the court imposed were authorized fines, and Hernandez forfeited his argument that the trial court erred in imposing them.

Moreover, on the merits there was no error. Hernandez's argument assumes that the trial court applied the amended version of section 1202.4, subdivision (b)(1), rather than the version in effect when Hernandez committed his crimes, *and* that the trial court intended to impose only the minimum fine. Because the court imposed the fine without making any comment indicating it was imposing the minimum amount, we must presume that the court in its discretion considered and rejected the imposition of the minimum fee

15

of $200, and chose a fine of $240. (See Evid. Code, § 664 ["[i]t is presumed that official duty has been regularly performed"]; *In re Julian R.* (2009) 47 Cal.4th 487, 499 ["""a trial court is presumed to have been aware of and followed the applicable law"""]; *People v. Adanandus* (2007) 157 Cal.App.4th 496, 503 [reviewing court is entitled to presume that trial court knew and applied the appropriate governing law].) Because the maximum authorized restitution fine was $10,000, and the trial court imposed a fine of $240, Hernandez was not subjected to increased punishment and the fine did not violate the ex post facto prohibition.

## DISPOSITION

The judgment is modified by (1) striking the 10-year criminal street gang enhancement imposed pursuant to section 186.22, subdivision (b)(1)(C), on count 1 and imposing the 15-year minimum parole eligibility requirement under section 186.22, subdivision (b)(5), and (2), awarding Hernandez presentence custody credits for actual time served in an amount to be determined by the trial court. As modified, the judgment is affirmed. The matter is remanded to the trial court to determine the amount of actual custody credits to which Hernandez is entitled and to prepare a corrected abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.                    ZELON, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.